**ALDON ACCESSORIES LTD.,**
Plaintiff-Appellee,

v.

**SPIEGEL, INC., Defendant-Appellant.**

**No. 1184, Dockets 83–9075, 84–7057.**

United States Court of Appeals,
Second Circuit.

Argued May 31, 1984.

Decided June 22, 1984.

Certiorari Denied Nov. 5, 1984.
See 105 S.Ct. 387.

James T. FitzGibbon, Chicago, Ill. (James T. FitzGibbon, P.C., Angelo J. Bufalino, Chicago, Ill., Wilson, Elser, Edelman & Dicker, New York City, of counsel), for defendant-appellant.

George Pollack, New York City, for plaintiff-appellee.

Before FEINBERG, Chief Judge, and KAUFMAN and PIERCE, Circuit Judges.

FEINBERG, Chief Judge:

Defendant Spiegel, Inc. appeals from a judgment entered in the United States District Court for the Southern District of New York, Pierre N. Leval, J., in favor of plaintiff Aldon Accessories Ltd. for $104,400 and interest at 9.93% for copyright infringement, in violation of 17 U.S.C. § 504. Judge Leval denied a motion by Spiegel for a new trial on condition that Aldon agree to remit $20,000 from the jury verdict of $124,400. Spiegel raises numerous arguments before us, all of which are without merit. We find only two that warrant discussion. These concern the scope of the "work made for hire" doctrine under the 1976 Copyright Act and the propriety of the jury instructions on access and similarity.

For reasons given below, we affirm the judgment of the district court.

## I.

This case arises out of Spiegel's sale, through its widely circulated catalogs, of brass unicorn statuettes that the jury found infringed a valid copyright held by Aldon. There was evidence introduced at the trial from which the jury could, and apparently did, find the following: Aldon is primarily in the business of designing and marketing figurines and other decorative pieces for the home. Most of these are copyrighted by Aldon and represented as exclusively its own. Nationwide sales are made wholesale through catalogs, a showroom in New York City, sales representatives and exhibit booths at trade shows throughout the country. Aldon does not deal directly with consumers.

Aldon has two principals, Arthur Ginsberg, who handles the creative and production side of the business, and his brother, Irwin Ginsberg, who handles sales. Some time in 1977, Arthur Ginsberg ("Ginsberg") conceived of a novel line of statuettes depicting mythological creatures, including a unicorn and a Pegasus. In September 1977, Ginsberg wrote a Japanese trading firm, Wado International Corporation, concerning the design and production of the unicorn and Pegasus, ultimately to be done in porcelain. The letter stated in part:

We just got an idea to do several Mythological animal[s], one called UNICORN & the other PEGASUS. Please examine the two clippings attached. Note that they both are similar to horses, especially the Pegasus (with eagle-like wings). While the Unicorn has a little beard and split hooves, it still resembles a horse and we do not want to have the beard and the hooves must be like a regular horse.

You remember last year with Okumura that I was trying to design horses but that they were too expensive because they were on their rear legs and had no center support? I'm sure you still have the sketches. Well, we want this pose for both the Unicorn and Pegasus. That is, both should be rearing up on their back legs with the front legs posed as if "kicking out" ... a feeling of motion or action. The tails should be very full (like on the Unicorn clipping) and touching the base to give additional support. Please make the base as thin & small as possible but make sure the piece stands securely and won't easily fall over.

Shortly thereafter, Ginsberg also sent Wado a very rough sketch of the pose he had in mind for the unicorn and the Pegasus, apparently to remind Wado of the sketches and discussions mentioned in his earlier letter.

In late October or early November, Ginsberg traveled to Japan to work with artists hired by Wado in developing models of the statuettes he had in mind. In describing his participation, Ginsberg testified as follows:

An artist that had worked with me and I sat down together, and we took some of the sketches that we had made on my previous visit ... and we tried to go over those sketches that we both had done together, to come up with a shape or form that would satisfy me for its acceptability. And finally the artist and I agreed on a certain kind of pose, certain proportions for the horse, the muscula-

ture, the way the mane was supposed to be done, the sense of its movement, the way it would be produced ... [a]nd setting up sketches at that first instance, that would at once be aesthetically pleasing to me and that would have marketability and at the same time as a practical matter could be made economically.

.    .    .    .    .

After the sketches were agreed upon we had a model maker who makes models in clay, and interpreting from a two-dimensional sketch to a three-dimensional model takes a lot of work until it is satisfactory. And the model was prepared in front of me, and we spent hours and hours changing shapes, adjusting attitudes and proportions until finally I thought there was a model that I liked.

The process took three days, producing at the end a clay model that was substantially identical to the porcelain unicorn ultimately marketed by Aldon. Ginsberg testified at length as to the precise nature of his interaction with the artists. The gist of his testimony was that while he is not an artist and did not do the sketching or sculpting, he actively supervised and directed the work step by step. For example, Ginsberg testified, "The artist will do it this way, and I will say 'No, put the leg this way, make this proportion, put the head this way, make the hair that way.'"

Aldon first received selling samples of the porcelain unicorn in early 1979 and began advertising by brochures and a general mailing. In July 1980, Ginsberg filed a certificate of copyright registration for the porcelain unicorn in which he identified Aldon as the author and indicated that authorship of the statuette was based on its being a "work made for hire."

Meanwhile, in August 1979, Ginsberg wrote to the Unibright Company in Taiwan to initiate the development of solid brass versions of Aldon's exclusive porcelain unicorn and Pegasus statuettes. Ginsberg expressed interest in producing three sizes: approximately five, seven and ten inches high. He included a color photograph of the porcelain statuettes and sent samples

of them separately. In October 1979, Ginsberg visited the Unibright firm during a four-week trip to Taiwan. He testified to working with the Unibright employees in essentially the same manner as he had worked with the Wado artists in developing the porcelain statuettes. Several changes were made from the porcelain design at Ginsberg's direction. Before he left Taiwan, he had final brass models for each of the three sizes he wanted, different in base, tail and head from the porcelain version and each of the sizes slightly different from the others. In July 1980, Ginsberg filed a certificate of copyright registration for the three brass unicorns as works derived from the earlier porcelain unicorn. He listed Aldon as the author and indicated "work made for hire."

Aldon had received the first production samples of the brass unicorns in January 1980. The whole series of brass and porcelain unicorn and Pegasus statuettes was included in Aldon's 1980 and 1981 catalogs and was advertised by a photograph in the January 1981 issue of Gifts & Decorative Accessories magazine, a trade publication. The series was also displayed by Aldon at the Chicago Gift Show in late January 1981. Irwin Ginsberg testified that one of Spiegel's buyers, Jan Vercillo, spent about a half hour at Aldon's booth during this show and examined the entire unicorn collection. Prices were pasted on the bottom of each item, right next to Aldon's copyright notice. Vecillo requested that samples be sent to her, took an Aldon catalog and said she would get in touch with Irwin Ginsberg as soon as she received the samples. The requested samples were sent, but repeated efforts by him to contact Vercillo over the next six to eight weeks were unavailing; Vercillo did not return any of his calls.

Arthur Ginsberg further testified that he first became aware in the middle of 1981 that Spiegel was selling through its catalogs brass unicorns identical to Aldon's unicorns. Attempts to get Spiegel to cease its sales of the brass unicorns were unsuccessful, and this litigation ensued. At trial, the

thrust of Spiegel's defense was that the copyright was invalid and that Spiegel had ordered its unicorns from Taiwan before it had access to Aldon's literature and statuettes. Spiegel's buyer, Ms. Vercillo, testified and disputed key aspects of the Ginsbergs' testimony. For example, she claimed her visit to the Aldon booth took place at a show in July and not in January, after Spiegel's catalog containing the brass statuettes had "closed" or gone into production. Such questions of fact, of course, were for the jury, which apparently decided them in favor of Aldon. For the purposes of this appeal, we do not need to describe any more of the proof offered by both Aldon and Spiegel.

## II.

Spiegel argues that the trial judge gave an erroneous charge on the "work made for hire" provision of the 1976 Copyright Act, 17 U.S.C. § 101.[1] Specifically, Spiegel objects to the following instruction:

A work for hire is a work prepared by what the law calls an employee working within the scope of his employment. What that means is, a person acting under the direction and supervision of the hiring author, at the hiring author's instance and expense. It does not matter whether the for-hire creator is an employee in the sense of having a regular job with the hiring author. What matters is whether the hiring author caused the work to be made and exercised the right to direct and supervise the creation.

Spiegel concedes that this may have been a correct instruction under the old copyright law, but maintains that under the express statutory definition of a "work made for hire" of the new Act, see note 1 supra, a change was made from the prior work for hire doctrine.[2] Spiegel reasons essentially as follows: Regular employees and independent contractors are treated separately under the new Act, and independent contractors are covered exclusively by subdivision (2) of the definition. Because the artists and artisans of Wado and Unibright were not regular employees of Aldon, the porcelain and brass unicorns could be considered works for hire only if they fell within one of the categories of "specially ordered or commissioned" works listed in subdivision (2) and then only if the parties agreed in a signed instrument that they would be considered works for hire. The instruction, however, permitted the jury to find a work for hire by an independent contractor if the work was "at the hiring author's instance and expense" and if "the hiring author ... exercised the right to direct and supervise the creation," without reference to the categories of subdivision (2) or to the requirement of a written instrument. In the instant case, there was no written instrument and the statuettes did not fall within one of the listed categories in subdivision (2).

Spiegel is correct that the statuettes could not be considered works for hire under subdivision (2) of the new statutory definition. But Spiegel gives an overly restrictive interpretation of subdivision (1), "a

1. That section provides the following definition:
 A "work made for hire" is—
 (1) a work prepared by an employee within the scope of his or her employment; or
 (2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire. For the purpose of the foregoing sentence, a "supplementary work" is a work prepared for publication as a secondary adjunct to a work by another author

for the purpose of introducing, concluding, illustrating, explaining, revising, commenting upon, or assisting in the use of the other work, such as forewords, afterwords, pictorial illustrations, maps, charts, tables, editorial notes, musical arrangements, answer material for tests, bibliographies, appendixes, and indexes, and an "instructional text" is a literary, pictorial, or graphic work prepared for publication and with the purpose of use in systematic instructional activities.

2. Except when quoting from the statute, we will use the shorter phrase "work for hire," instead of the slightly awkward and cumbersome phrase "work made for hire."

work prepared by an employee within the scope of his or her employment." We find the judge's instruction to be a proper interpretation of this subdivision. Under the 1909 Act and decisions construing it, if an employer supervised and directed the work, an employer-employee relationship could be found even though the employee was not a regular or formal employee. See *Epoch Producing Corp. v. Killiam Shows, Inc.*, 522 F.2d 737, 744 (2d Cir.1975), cert. denied, 424 U.S. 955, 96 S.Ct. 1429, 47 L.Ed.2d 360 (1976); *Picture Music, Inc. v. Bourne, Inc.*, 457 F.2d 1213, 1216–17 (2d Cir.), cert. denied, 409 U.S. 997, 93 S.Ct. 320, 34 L.Ed.2d 262 (1972); *Donaldson Publishing Co. v. Bregman, Vocco & Conn, Inc.*, 375 F.2d 639, 643 (2d Cir.1967), cert. denied, 389 U.S. 1036, 88 S.Ct. 768, 19 L.Ed.2d 823 (1968). Nothing in the 1976 Act or its legislative history indicates that Congress intended to dispense with this prior law applying the concepts of "employee" and "scope of employment." See *Aitken, Hazen, Hoffman, Miller, P.C. v. Empire Construction Co.*, 542 F.Supp. 252, 257–58 (D.Neb.1982). The new Act does not define these key terms, thus suggesting that it is necessary to look at the general law of agency as applied by prior copyright cases in applying subdivision (1) under the new Act. 1 M. Nimmer, Nimmer on Copyright § 5.03[B][1] at 5–12 to 5–13 (1983). Indeed, the legislative history states that the new Act "adopts one of the basic principles of the present law: that in the case of works made for hire the employer is considered the author of the work." H.R.Rep. No. 1476, 94th Cong., 2d Sess. 121, reprinted in 1976 U.S.Code Cong. & Ad.News 5659, 5736. Had Congress intended, as apparently argued by Spiegel, to narrow the type of employment relationships within the work for hire doctrine to include only "regular" employees, it is unlikely that there would have been no discussion of this change in the legislative history.

The legislative history does indicate that Congress intended to change prior work for hire law dealing with "works prepared on special order or commission," id., 1976 U.S.Code Cong. & Ad.News at 5737. Under prior law, in dealing with *all* works done by an independent contractor, the courts "presume[d] in the absence of contrary proof that the parties expected the employer to own the copyright and that the artist set his price accordingly." *May v. Morganelli-Heumann & Associates*, 618 F.2d 1363, 1368 (9th Cir.1980), citing *Scherr v. Universal Match Corporation*, 417 F.2d 497, 502 (2d Cir.1969) (Friendly, J., dissenting), cert. denied, 397 U.S. 936, 90 S.Ct. 945, 25 L.Ed.2d 116 (1970), and *Brattleboro Publishing Co. v. Winmill Publishing Corp.*, 369 F.2d 565 (2d Cir.1966); see *Roth v. Pritikin*, 710 F.2d 934, 937 n. 3 (2d Cir.), cert. denied, —— U.S. ——, 104 S.Ct. 394, 78 L.Ed.2d 337 (1983). The presumption applied to all works prepared by an independent contractor, regardless of the presence or absence of direction and supervision by the hiring party. It was apparently felt that this frequently worked an injustice in those situations where the contractor did all of the creative work and the hiring party did little or nothing. H.R. No. 1476, supra, at 121, 1976 U.S.Code Cong. & Ad.News at 5737. Subdivision (2) of the work for hire definition in the new Act is a carefully drafted change in this aspect of the prior law. But there is no indication in the legislative history or elsewhere that Congress was focusing on contractors who were actually sufficiently supervised and directed by the hiring party to be considered "employees" acting within "the scope of employment." Rather, as indicated earlier, we believe and hold that Congress intended the prior law in such situations to remain unchanged.

The cases cited by Spiegel are not to the contrary. In *Meltzer v. Zoller*, 520 F.Supp. 847, 854–57 (D.N.J.1981), the court appeared to conclude that subdivision (2) of the definition under the 1976 Act was the exclusive provision covering independent contractors. But that simply frames the issue: is the contractor "independent" or is the contractor so controlled and supervised in the creation of the particular work by the employing party that an employer-employee relationship exists. The latter is

covered by subdivision (1). The *Meltzer* court was not required to consider the range of employer-employee relationships covered by subdivision (1) of the work for hire definition because it found as facts that plaintiff's contribution to the architectural plans at issue was minimal, that the plans differed only slightly from the firm's standard plans and that the firm was an independent contractor.

*May v. Morganelli-Heumann & Associates*, supra, also involving architectural plans, simply applied the prior work for hire law as to independent contractors because the events at issue antedated January 1, 1978, the effective date of the 1976 Act. The issue was whether the presumption of copyright ownership in the hiring party was rebutted by the proof of a contrary intent evidenced by custom and usage of the architectural profession. In a footnote, id. at 1368 n. 4, however, the court stated that it viewed the architect as an independent contractor and not an employee and that the work for hire doctrine of the new Act would not apply. This is not inconsistent with our conclusion here, because there is no evidence that the hiring party in *Morganelli-Heumann* actively participated in drafting the plans.[3]

Our conclusion that the judge's charge was not incorrect does not produce a result at odds with the Congressional intent. There was evidence in this case that Ginsberg did much more than communicate a general concept or idea to the Japanese and Taiwanese artists and artisans, leaving creation of the expression solely to them.

There was evidence that Ginsberg actively supervised and directed the creation of both the porcelain and brass statuettes. While he did not physically wield the sketching pen and sculpting tools, he stood over the artists and artisans at critical stages of the process, telling them exactly what to do. He was, in a very real sense, the artistic creator. Citing *Florabelle Flowers, Inc. v. Joseph Markovits, Inc.*, 296 F.Supp. 304 (S.D.N.Y.1968), Spiegel argues that, as in that case, Ginsberg had no more than a general conception and the creation was done by the artists and artisans. In *Florabelle*, the judge was acting as fact-finder on a motion for a preliminary injunction and there was virtually no evidence of participation by the plaintiff in the physical creation of the artificial flower in dispute. Here, the question of supervision and direction by Ginsberg was submitted to the jury, and their finding, implicit in the verdict, of an employer-employee relationship is supported by ample evidence.

### III.

Spiegel also objects to the judge's charge on the relationship between proof of access and proof of similarity in determining whether copying had occurred. One sentence of the charge, quoted selectively by Spiegel, arguably could be interpreted as an instruction that the more convincing the proof of access by the copier the less impressive the similarities have to be to support a conclusion of copying. The sentence at issue is quoted in context in the margin.[4] Spiegel claims that this instruc-

---

3. Cf. *Childers v. High Society Magazine, Inc.*, 557 F.Supp. 978, 984 (independent photographer; "Defendants cannot possibly assert that plaintiff is an 'employee'."), aff'd on rehearing, 561 F.Supp. 1374 (S.D.N.Y.1983).

Both parties agree that the facts of this case are similar to *Goldman-Morgen, Inc. v. Dan Brechner & Co.*, 411 F.Supp. 382 (S.D.N.Y.1976), but that case is of no assistance here because the court applied the prior law on independent contractors, now changed by subdivision (2) of the work for hire definition, and had no need to consider whether plaintiff's participation with the Japanese artists in the design of a novel child's bank was sufficient to constitute an employer-employee relationship, id. at 385, 391,

now covered by subdivision (1) of the definition.

4. As with all circumstantial evidence, you must use your common sense. That is what circumstantial evidence is all about: common sense. The strength required of any one element or the strength of the proof on any one of those questions depends in a way on the strength of the others. If the degree of similarity between the two works is overwhelming and the similar elements are of such an unusual or distinct nature that it is unlikely that someone else would have dreamed them up on his own or arrived at them in any way other than by copying, and if there is no apparent other source for those similar

tion allowed the jury to find copying without also finding substantial similarity between Aldon's and Spiegel's statuettes. However, we do not think this is so. The judge had just said that "overwhelming" similarity where "the similar elements are of such an unusual or distinct nature that it is unlikely that someone else would have dreamed them up on his own or arrived at them in any way other than by copying" permitted an inference of copying "without very convincing proof" of access. The next sentence, here challenged by Spiegel, simply advised the jury that such an "overwhelming" degree of similarity was not required where proof of access was present. See 3 Nimmer on Copyright, supra, § 13.03[D] at 13–39. In any event, even if the sentence is interpreted to communicate the meaning attributed by Spiegel, the error was harmless, in view of the statement of Spiegel's counsel to the jury that "I won't tell you that [Aldon's and Spiegel's] products aren't virtually the same." Moreover, a reading of the entire eight-page charge on copying leaves no doubt that the judge properly charged the jury on similarity.

The judgment of the district court is affirmed. The parties' respective requests for award of attorneys' fees are denied.[5]

elements than the plaintiff's work, a strong case of copying would be made by reason of those similarities, even without very convincing proof of the defendant's access to the plaintiff's work.

*On the other hand, the more convincing the proof of access by the copier, the assumed copier [of] the plaintiff's work, the less impressive the similarities have to be to support a conclusion of copying.* You should consider these and all other logically relevant circumstances in deciding whether you find that the defendant copied the plaintiff's work. [Emphasis added.]

5. Aldon challenges the granting of the $20,000 remittitur and requests that the full jury verdict be restored. Aldon accepted the remittitur, and under established law in this circuit could not raise the issue even if it had cross-appealed, which it has not. *Akermanis v. Sea-Land Service, Inc.,* 688 F.2d 898, 903 (2d Cir.1982), cert. denied, —— U.S. ——, 103 S.Ct. 2087, 77 L.Ed.2d 298 (1983) and —— U.S. ——, 104 S.Ct. 700, 79 L.Ed.2d 165 (1984).