865 F.2d 1093
 57 USLW 2456, 1989 Copr.L.Dec. P 26,371,
9 U.S.P.Q.2d 1701
 Jennifer DUMAS, an individual and successor-in-interest to
Patrick Nagel, Plaintiff-Appellee,
v.
Stefan GOMMERMAN, dba Eva & Steve Dorog Gallery; S & I
Gommerman Publishing, Inc., Defendants-Appellants.
 No. 87-6542.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 3, 1988.
Decided Jan. 13, 1989.
 
 Jay S. Rothman and Leland (L.L.) Whitney, Encino, Cal., for defendants-appellants.
 Gary S. Phillips and Anthony Kornarens, Rosenberg, Nagler & Phillips, Beverly Hills, Cal., for plaintiff-appellee.
 Appeal from the United States District Court for the Central District of California.
 Before FLETCHER, CANBY and O'SCANNLAIN, Circuit Judges.
 FLETCHER, Circuit Judge:
 
 
 1
 Defendants appeal the grant of a preliminary injunction restraining them from reproducing and marketing works of art in which plaintiffs claim copyrights. This copyright infringement case requires us to construe for the first time in this circuit the work for hire provisions of the 1976 Copyright Act, 17 U.S.C. Sec. 101 et seq.
 
 I. FACTS
 
 2
 The parties dispute the ownership of copyrights in four works of art (the "ITT works"[1]). The ITT works were produced in 1979 by Patrick Nagel, a graphic artist and commercial illustrator, on contract to the advertising agency of D'Arcy, MacManus & Masius, Inc. (D'Arcy) on behalf of its client, ITT Cannon, a corporate manufacturing entity. None of the original actors is a party to this suit.
 
 
 3
 Jennifer Dumas, plaintiff-appellee, is Nagel's widow and the representative of his estate. Upon Nagel's death in 1984 she became the successor in interest to copyrights he held in his works. She contends that Nagel, as an independent contractor, was the author of the ITT works and under the 1976 Act retained ownership of the copyrights.
 
 
 4
 Stefan Gommerman, defendant-appellant, is the owner of an art gallery in Los Angeles, California doing business as Eva & Steve Dorog Gallery. S & I Gommerman Publishing, Inc. is a California corporation doing business as an art publisher. (Defendants collectively will be referred to as "Gommerman".) Gommerman contends that he purchased the copyrights from ITT Cannon which, as Nagel's employer, was the author of the ITT works.
 
 
 5
 In 1979 ITT Cannon, through D'Arcy, commissioned Nagel to create four works of art that Cannon would give as sets of lithographs to its distributors as part of a promotional campaign. The paintings' content and some aspects of the design, borders, and placement of figures allegedly were determined by D'Arcy, which provided Nagel with sketches to use in preparing his illustrations. The purchase order does not specify that the works were works for hire nor does it transfer the copyright to ITT Cannon.
 
 
 6
 ITT Cannon accepted and paid for Nagel's paintings, but, because the promotional giveaway was less than successful, was left with many extra sets of lithographs. At some point, ITT Cannon threw away the four original paintings. Several years later Stefan Gommerman learned of the existence of these lithographs, and in 1985 purchased the remaining sets from ITT Cannon.[2] At that time he also purchased from ITT any copyrights to the ITT works which ITT may have held and, in January 1986, registered each of the four works in his name.
 
 
 7
 Dumas learned of the purported copyright transfer in January 1986 and, by letter to Gommerman and ITT Cannon, notified them of her claim of copyright ownership. Gommerman nevertheless proceeded with poster reproduction of one of the works and took purchase orders from around the United States. Dumas filed a conflicting registration of copyright on May 8, 1987.
 
 
 8
 On June 22, 1987 Dumas filed a complaint against Gommerman for damages and declaratory relief for copyright infringement under 17 U.S.C. Sec. 101 et seq. and for unauthorized use of a deceased personality's name in violation of California Civil Code Sec. 990. On June 23, 1987 she moved for a preliminary injunction to prevent Gommerman from manufacturing, distributing, or copying the lithographs in dispute. The district court granted the preliminary injunction on August 12, 1987 and extended it on October 7, 1987. The injunction specified that neither Gommerman nor his business, nor his business entities, nor his agents may 1) reproduce or otherwise manufacture the ITT works; or 2) sell, advertise, or in any way distribute reproductions of the ITT works already in the possession of the defendants. The court also ordered Dumas to refrain from publicizing the fact of the preliminary injunction. Gommerman timely appeals. This court has jurisdiction under 28 U.S.C. Sec. 1292(a)(1).
 
 II. DISCUSSION
 
 9
 Our review of a preliminary injunction is limited. The grant or denial of a preliminary injunction will be reversed only where the district court abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact. Colorado River Indian Tribes v. Town of Parker, 776 F.2d 846, 849 (9th Cir.1985); Fed.R.Civ.P. 52(a). We review de novo the correctness of the legal standards employed by the district court in evaluating the plaintiff's likelihood of success on the merits.
 
 
 10
 The parties do not contest that the district court employed the correct legal standard for granting a preliminary injunction: that the party seeking the injunction must show either a likelihood of success on the merits and the possibility of irreparable injury or that serious questions going to the merits are raised and the balance of hardships tips sharply in her favor. This test is to be viewed as a continuum. Benda v. Grand Lodge of the Int'l Ass'n of Machinists & Aerospace Workers, 584 F.2d 308, 314-15 (9th Cir.1978).
 
 
 11
 The sole issue Gommerman raises on appeal is whether the district court applied the correct legal standard in determining whether Nagel was an employee producing "works for hire" under 17 U.S.C. Sec. 101. Gommerman has conceded all other issues regarding the issuance of the preliminary injunction.[3]
 
 
 12
 The district court found that Nagel could not be considered an "employee" for purposes of the Copyright Act "because defendant ITT CANNON did not exercise sufficient direction and control over Mr. Nagel in the creation of the ITT Works." Conclusion of Law No. 6, SER at 19. Gommerman agrees with the district court's use of a "supervision and control" test, but argues that the district court erroneously employed too strict a test by requiring proof of significant control. Gommerman contends that any control, or just limited control, should suffice to make an independent contractor an employee. The issue, he argues, "is whether the creativity has been directed and controlled to any amount by the hiring party." Appellant's Brief at 23 (emphasis added). "Any identifiable direction and control is adequate." Id. at 25.
 
 
 13
 Dumas does not quarrel with the district court's choice of test (the Aldon "supervision and control" test, discussed below), but does suggest an even narrower standard (the Easter Seal Society "literal interpretation", discussed below) would have been preferable. She further contends that under either analysis Nagel would not be an "employee."
 
 A. History of the Work for Hire Doctrine
 
 14
 The Copyright Act of 1909 made the employer the "author" and initial copyright holder of "works made for hire." 17 U.S.C. Sec. 26 (repealed). Definition of "works made for hire" was left to the courts. Beginning from early cases holding that a commission contract would be presumed to assign the copyright to the patron unless the parties expressly or implicitly provided otherwise, see, e.g., Yardley v. Houghton Mifflin Co., 108 F.2d 28 (2d Cir.1939),[4] the rule was gradually expanded into a presumption that anyone who paid an artist to create a copyrightable work was the statutory author under the work for hire doctrine.[5] See Murray v. Gelderman, 566 F.2d 1307, 1309-10 (5th Cir.1978) (copyright in book written under contract vested in employer, even though author had specifically bargained for complete control over the work); see generally, Comment, Commissioned Works as Works Made for Hire Under the 1976 Copyright Act: Misinterpretation and Injustice, 135 U.Pa.L.Rev. 1281, 1282-89 (1987) [hereinafter Comment, Commissioned Works ].
 
 
 15
 This circuit's most recent case interpreting work for hire under the 1909 Act followed this approach, presuming "that the parties expected the employer to own the copyright and that the artist set his price accordingly." May v. Morganelli-Heumann & Assoc., 618 F.2d 1363, 1368 (9th Cir.1980). May involved architectural designs for a residence and horse training facilities. We noted that although the architect's designs were works for hire under the 1909 precedent, the 1976 Act would require the contrary result. 618 F.2d at 1368 n. 4.
 
 
 16
 B. The Work for Hire Doctrine Under the 1976 Act
 
 
 17
 Whether Nagel, a freelance artist, produced the ITT works as an "employee" or as an independent contractor hinges on how the term "employee" is to be defined under 17 U.S.C. Sec. 101. If Nagel was an employee, the ITT works were "made for hire" and ITT Cannon is the author. If he was an independent contractor, he retained authorship because the works do not fit under any of the nine enumerated categories of commissioned works in Sec. 101(2) and there was no express written agreement.
 
 
 18
 No circuit, in deciding copyright ownership under the 1976 Act, has continued to follow the employer-oriented approach of cases decided under the 1909 Act. As will be discussed more fully below, the legislative history of the 1976 Act and the Act's inclusion of a definition of "works made for hire" demonstrate that Congress did not intend a continuation of the status quo.[6]
 
 
 19
 To interpret the work for hire provisions, we must begin with a review of the relevant statutory language. If that is not clear, we then proceed to consider pertinent legislative history. Middlesex County Sewerage Authority v. National Sea Clammers Ass'n, 453 U.S. 1, 13, 101 S.Ct. 2615, 2622, 69 L.Ed.2d 435 (1981). Furthermore, a statute that "is part of an organic whole ... should be viewed in context with the whole of which it is a part." United States v. Hells Canyon Guide Service, Inc., 660 F.2d 735, 737 (9th Cir.1981).
 
 1. Statutory Language
 
 20
 The Copyright Act of 1976 provides that "[c]opyright ... vests initially in the author or authors of the work." 17 U.S.C. Sec. 201(a). In the case of a work made for hire,
 
 
 21
 ... the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright.
 
 
 22
 17 U.S.C. Sec. 201(b).
 
 The Act defines a "work made for hire" as:
 
 23
 (1) a work prepared by an employee within the scope of his or her employment; or
 
 
 24
 (2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire.
 
 
 25
 17 U.S.C. Sec. 101. The Act nowhere defines the key terms "employee," "employer," or "scope of employment."
 
 2. Statutory Context
 
 26
 In examining the work for hire provisions, we must of course understand them in their statutory context. There is considerable interaction among the various sections of the Act. Under the 1909 Act, federal copyright was secured by publication with notice. 17 U.S.C. Sec. 10 (repealed).[7] The 1976 Act changed this law, providing that copyright subsists from the moment of fixation, not publication. 17 U.S.C. Sec. 102(a).[8] Copyright under the 1976 Act thus exists even in works in progress. See 17 U.S.C. Sec. 101, definitions of "created" and "fixed." A transfer of copyright ownership requires a written instrument. 17 U.S.C. Sec. 204(a). The transfer of a material object in which a work is fixed does not transfer the copyright in the work. 17 U.S.C. Sec. 202.[9]
 
 
 27
 Section 201(b) is therefore necessary to establish the employer as initial owner of the copyright in works made for hire. Without this provision, copyright would vest in employees at the moment of fixation, and a written instrument would be required to transfer copyright ownership to the employer.
 
 
 28
 A more important effect of section 201(b) is to eliminate termination rights that the employee would otherwise have if ownership vested in the employer by transfer, rather than ab initio. 17 U.S.C. Sec. 203(a) provides that for works other than those made for hire, a transfer or license of the copyright or any right under the copyright is subject to termination 35 years after the transfer or license is made. This provision was intended to adjust for "the unequal bargaining position of authors, resulting in part from the impossibility of determining a work's value until it has been exploited." H.R.Rep. No. 94-1476, 94th Cong., 2d Sess. 124 (1976), U.S.Code Cong. & Admin.News 1976, p. 5740. Designating a work as "made for hire" irretrievably takes away more than just the artist's copyright; it also deprives him or her of the opportunity to renegotiate the transfer after the market value of the work has been more precisely determined.[10]
 
 3. Legislative History
 
 29
 To fully understand the meaning of "employee" as used in the Act, we must turn to its legislative history. The House Report offers only minimal additional guidance in interpreting the scope of the "work for hire" doctrine. We learn that Congress rejected a proposal by screenwriters and film music composers which would have recognized something similar to the "shop right" doctrine of patent law. That doctrine gives the employer only a right to use the employee's work to the extent necessary for its regular business. The employee would retain all other rights, subject to a covenant not to authorize competing uses. H.R.Rep. No. 94-1476, at 121, U.S.Code Cong. & Admin.News 1976, p. 5737.
 
 
 30
 In light of the decision to give employers broad rights in "works for hire," what works would be encompassed within the definition became central to the debate. According to the House Report,
 
 
 31
 The status of works prepared on special order or commission was a major issue in the development of the definition of "works made for hire" in section 101, which has undergone extensive revision during the legislative process. The basic problem is how to draw a statutory line between those works written on special order or commission that should be considered as "works made for hire," and those that should not. The definition now provided by the bill represents a compromise which, in effect, spells out those specific categories of commissioned works that can be considered "works made for hire" under certain circumstances.
 
 
 32
 H.R.Rep. No. 94-1476, at 121, U.S.Code Cong. & Admin.News 1976, p. 5737.
 
 
 33
 The "compromise" referred to by the House Report was reached in 1965 as the product of hard-fought negotiations,[11] and was drafted ten years before passage. "It is therefore not surprising that the early legislative history omits mention of any change in the meaning of the term 'employee,' although plenty of discussion indicates that everyone involved understood the term to mean someone working for an employer in a salaried job, and understood the term to exclude freelance workers completely." Litman, Copyright, Compromise, and Legislative History, 72 Cornell L.Rev. 857, 901 (1987) (emphasis added) [hereinafter Litman]; see generally, id. at 888-93.
 
 
 34
 The reference to "compromise" in the House Report takes on added significance when we probe more deeply into the history of the Act. The search for the legislative intent of the Act differs substantially from that which we are accustomed to undertake. As one scholar describes it:
 
 
 35
 Th[e] legislative history reflects an anomalous legislative process designed to force special interest groups to negotiate with one another.... The legislative materials disclose a process of continuing negotiations among various industry representatives, designed and supervised by Congress and the Copyright Office and aimed at forging a modern copyright statute from a negotiated consensus. During more than twenty years of negotiations, the substantive content of the statute emerged as a series of interrelated and dependant compromises among industries with differing interests in copyright.
 
 
 36
 Litman, at 862 (footnotes omitted). Much of the Act can be seen as a virtual contract between creators and marketers of copyrighted materials. Many of the Act's provisions have considerable impact on these two interest groups without any broader effect beyond. The work for hire provisions are in this mold. In interpreting them, we quite properly are concerned with what the private interest groups, the negotiators, thought the terms meant when they negotiated and agreed to them. Congress's intent clearly was to embody in the Act the negotiated compromises. We must be careful not to distort the bargain reached after so many years of negotiation and compromise.
 
 
 37
 At the beginning of the copyright revision process, the Register of Copyrights informally proposed defining "works made for hire" so as to exclude all commissioned works. See House Comm. on the Judiciary, 87th Cong., 1st Sess., Copyright Law Revision: Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law 86 (Comm. Print 1961). Discussions on this Report by industry representatives addressed concerns with this proposed definition. Artists' representatives wanted work for hire status to be based on clear presumptions, particularly to avoid the possibility of artists signing away their rights in contracts which designated even already-existing works as "made for hire." See House Comm. on the Judiciary, 88th Cong., 1st Sess., Copyright Law Revision Part 2: Discussion and Comments on Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law 152-53 (Comm. Print 1963) (remarks of Irwin Karp, Authors League of America); id. at 158-59 (remarks of John Schulman, American Patent Law Association Comm. on Copyright). Publishing and motion picture interests were concerned with the treatment of composite works, pointing out the need of the movie and publishing industries to rely extensively on outside contractors. See, e.g., id. at 153-59 (remarks of Adolph Schimel, Universal Pictures Co.).
 
 
 38
 In 1964, the Register submitted a formal proposed definition of "work made for hire":
 
 
 39
 a work prepared by an employee within the scope of the duties of his employment, but not including a work made on special order or commission.
 
 
 40
 House Comm. on the Judiciary, 88th Cong., 2d Sess., Copyright Law Revision Part 3: Preliminary Draft and Discussion and Comments 15 n. 11 (Comm. Print 1964) (footnote to proposed Sec. 14(c)).[12] This definition met with considerable opposition from publishers and movie producers. See, e.g., id. at 258-60 (remarks of music, book, and magazine publishers); id. at 264 (definition should include works where the employer supplies supervision and control); id. at 266-67 (same); id. at 267 (suggested change of term "employer" to "hirer" in order to include nonemployees working on commission); id. at 273 (suggestion that work for hire be defined with specific reference to "master and servant"); id. at 275 (suggestion that law refer to "contract of service"). The provision in the draft bill was understood to cover only work done by a salaried employee in the scope of his or her regular duties. See House Comm. on the Judiciary, 88th Cong., 2d Sess., Copyright Law Revision Part 4: Further Discussion and Comments on Preliminary Draft for Revised U.S. Copyright Law 248-50 (Comm. Print 1964) (written comments of American Book Publishers Council, Inc.). Publishers specifically sought to include such frequently commissioned contributions as translations, forewords, and maps. See id. at 274. Artists' representatives favored the Register's proposal, disputing the "but for" theory under which a corporation could be deemed an author simply because it initiated work by a creator, see Copyright Law Revision Part 3, supra, at 269, and emphasizing the need for clarity in the definition. Id. at 262; see also id. at 268 (clarity important to avoid confusion over ownership many years after purported transfer). The Authors League suggested that the Act provide specifically for dictionaries, encyclopedias, and other composite works made up of contributions procured by commission contract, rather than stretching the general definition of work for hire so as to include them. Copyright Law Revision Part 4, supra, at 313-14.
 
 
 41
 The 1964 Revision Bill sought to effect a compromise between these competing interests. It defined "work made for hire" as:
 
 
 42
 a work prepared by an employee within the scope of his employment, or a work prepared on special order or commission if the parties expressly agree in writing that it shall be considered a work made for hire.
 
 
 43
 House Comm. on the Judiciary, 89th Cong., 1st Sess., Copyright Law Revision Part 5: 1964 Revision Bill with Discussion and Comments 31 (Comm. Print 1965) (Revision Bill Sec. 54).[13] This provision was vehemently opposed by authors, who felt that publishers would always be in a position to require such a written agreement. Id. at 146-48.
 
 
 44
 The 1965 Revision Bill, H.R. 4347, consciously backed away from this definition, introducing the dichotomy that has survived into the 1976 Act. There were now two definitions of "works made for hire," the first covering regular employees, the second covering certain enumerated categories of commissioned works, which could be works for hire only if the commissioned party agreed in writing. The Register stated that "the definition [of "works made for hire"] now in section 101 represents a carefully worked out compromise aimed at balancing legitimate interests on both sides," adding that, except for the enumerated categories, "[o]ther works made on special order or commission would not come within the definition." Copyright Law Revision Part 6: Supplementary Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law 66-67 (Comm. Print 1965). This compromise was approved by all interested groups. See, e.g., Copyright Law Revision: Hearings on H.R. 4347, H.R. 5680, H.R. 6831, H.R. 6835 Before the Subcomm. on Courts, Civil Liberties, and the Administration of Justice of the House Judiciary Comm., 89th Cong., 1st Sess. 107 (1965) (testimony of Irwin Karp, Authors League of America, approving compromise on termination of transfers); id. at 129 (testimony of Horace Manges, American Book Publishers Council, same); id. at 257 (testimony of Tom Mahoney, Society of Magazine Writers, same); id. at 1048-49 (testimony of Adolph Schimel, Motion Picture Association of America, acceptance of termination provisions in "spirit of compromise"), id. at 1866 (testimony of Abraham Kaminstein, Register of Copyrights, linking compromises on termination and work for hire); id. at 994 (prepared statement of Motion Picture Association of America linking compromises on termination and work for hire).
 
 
 45
 Thus, in the package as finally approved, works for hire would not be subject to the artist's right to terminate transfers. In exchange, the old tests under the 1909 Act, which favored employers, would be replaced by a new definition distinguishing works prepared by employees within the scope of their employment from works prepared on commission. "[T]he content of the pre-legislative dialogue and the context in which it occurred indicate that by using the term 'employee' the parties meant to limit works made for hire under this branch of the definition to works created by a salaried worker in a long-term position." Litman, at 890 (emphasis added). Commissioned works, on the other hand, were to be treated as works for hire only if they fell within specific enumerated categories, and even then only if there was an agreement in writing that the work was a work for hire. 17 U.S.C. Sec. 101(2).[14]
 
 
 46
 A commission to produce a work of art is essentially just another contract. By designating some works as works for hire the statute functions, in the case of initial ownership of copyright, as a default mode, applying where the parties did not express their intentions in writing. Imposing the burden to contract to avoid the statutory rule on the purchaser, who generally has the stronger bargaining position and readier access to legal advice, is the intended balance. See Varmer, Works Made for Hire and on Commission, Study No. 13 for the Senate Subcommittee on Patents, Trademarks, and Copyrights 140, 86th Cong., 1st Sess., Copyright Law Revision (Comm. Print 1961) [hereinafter Varmer]. We need not assume that artists are always in an unequal bargaining position owing to their legendary habits of imprudence in business affairs, but they are nevertheless disadvantaged by the impossibility of determining their work's full value until it has been exploited. See H.R.Rep. No. 94-1476, at 124, U.S.Code Cong. & Admin.News 1976, p. 5739.
 
 
 47
 It can fairly be assumed that the buyer will virtually always be able to contract for ownership of the copyright; what the statute essentially protects is the artist's right to renegotiate the transfer at a later date under Sec. 203(a). By gaining passage of Sec. 101(2), the movie and publishing industries obtained the power to bargain for "work for hire" status for certain types of work. These are categories where such designations are especially crucial to buyers, principally owing to the number of workers involved in producing the final product. See Varmer, at 141. "Section 101(2) is really statutory permission for certain kinds of independent contractors to give 'authorship' to their buyers." Easter Seal Society v. Playboy Enterprises, 815 F.2d 323, 329 (5th Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 1280, 99 L.Ed.2d 491 (1988). In light of market realities, the need to deny such permission takes on added significance. The clear implication of Sec. 101(2) is that buyers of other sorts of works must not be allowed to achieve this designation.C. Disposition
 
 
 48
 Our analysis leads to a clear result in this case. Only the works of formal, salaried employees are covered by Sec. 101(1). Only certain types of specially commissioned works qualify as "work made for hire" under Sec. 101(2). Gommerman concedes that Nagel was not a formal employee of D'Arcy or ITT, and that the ITT works do not fall within any of the enumerated categories of Sec. 101(2). Therefore, the ITT works are not "works made for hire."
 
 
 49
 We recognize that not every circuit views this issue as we do. The Second and Seventh Circuits have resurrected approaches more suited to the era that pre-dated the 1976 Act. The Fifth and D.C. Circuits take an approach close to that which we adopt here, but still permit the consideration of factors which could distort the dichotomy in Sec. 101.
 
 
 50
 The Second and Seventh Circuits look to the employer's degree of control over the artist's work product to determine whether an independent contractor is nevertheless an "employee" and her work a "work for hire" under Sec. 201(b). More precisely, those circuits hold that the definitions in Sec. 101 require the court to determine whether an artist, hired to produce a specific work, was in fact "independent" or was "so controlled and supervised in the creation of the particular work by the employing party that an employer-employee relationship exists," in which case Sec. 101(1) applies. Aldon Accessories Ltd. v. Spiegel, Inc., 738 F.2d 548, 552 (2d Cir.), cert. denied, 469 U.S. 982, 105 S.Ct. 387, 83 L.Ed.2d 321 (1984); quoted and followed in Evans Newton Inc. v. Chicago Systems Software, 793 F.2d 889, 894 (7th Cir.), cert. denied, 479 U.S. 949, 107 S.Ct. 434, 93 L.Ed.2d 383 (1986); see also Baltimore Orioles v. Major League Baseball Players Assoc., 805 F.2d 663, 669 (7th Cir.1986), cert. denied, 480 U.S. 941, 107 S.Ct. 1593, 94 L.Ed.2d 782 (1987); Hays v. Sony Corp. of America, 847 F.2d 412, 416-17 (7th Cir.1988). Aldon affirmed a jury instruction which provided that the artist need not "hav[e] a regular job with the hiring author," so long as the employer "caused the work to be made and exercised the right to direct and supervise the creation." 738 F.2d at 551. The Aldon court did note, however, that the employer "actively supervised and directed the creation of" the artworks, standing over the artists and "telling them exactly what to do." 738 F.2d at 553. The Seventh Circuit also emphasized similar evidence of actual creative control. Evans Newton, 793 F.2d at 894.
 
 
 51
 This interpretation creates three categories of independent contractors: those who are actually "employees" because of the purchasing party's supervision and control; those whose commissioned works are works for hire because they fall into the categories of Sec. 101(2); and anyone left over, whose products are not works for hire.
 
 
 52
 The Aldon analysis simply fails to acknowledge the changes wrought by the 1976 Act on the work for hire doctrine, instead asserting that "[n]othing in the 1976 Act or its legislative history indicates that Congress intended to dispense with this prior law by applying the concepts of 'employee' and 'scope of employment.' " 738 F.2d at 552. It misapprehends the significance of legislative silence in the context of the development of the 1976 Act--perhaps understandably, but nonetheless erroneously. The 1976 Act was a "radical ... departure" from prior law. Ringer, First Thoughts on the Copyright Act of 1976, 13 Copyright 187, 188 (1977). In effect, the 1976 Act constitutes a new bargain between publishing and related interests on the one hand, and artists on the other. Where the drafters of the 1976 Act intended to include existing law, they stated that intention clearly. See, e.g., H.R.Rep. No. 94-1476, at 121, U.S.Code Cong. & Admin.News 1976, p. 5736 ("There is no need for a specific statutory provision concerning the rights and duties of the co-owners of a work; court-made law on this point is left undisturbed.") In light of the extensive negotiating history, it is wrong to assume that Congress intended to bring along all of the baggage attached to the 1909 Act wherever it failed explicitly to say otherwise.
 
 
 53
 The Aldon test distorts the balance reached in the 1965 compromise by protecting only a very limited class of independent contractors from the old law's injustice: "those situations where the contractor did all of the creative work and the hiring party did little or nothing." Aldon, 738 F.2d at 552. See also Comment, Commissioned Works, at 1305 (Aldon "erases twenty years of carefully crafted compromises.") Aldon's requirement of an analysis of supervision and control also undercuts the intent of the drafters of Sec. 101 to increase certainty over whether a work is made for hire. See Comment, Commissioned Works, at 1298, 1304 (Aldon "leaves the door open for hiring parties, who have failed to get a full assignment of copyright rights from independent contractors ... to unilaterally obtain [copyright] years after the work has been completed as long as they directed or supervised the work").
 
 
 54
 We agree with the Fifth Circuit's criticisms of Aldon in Easter Seal Society v. Playboy Enterprises, 815 F.2d 323, 331-34 (5th Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 1280, 99 L.Ed.2d 491 (1988): Aldon permits the outcome of copyright disputes to vary
 
 
 55
 even between the same buyer and same seller in a series of works produced together.... [B]uyers and sellers will have to predict in advance whether the buyer's 'actual control' over a given work will make it the 'author.' If they guess incorrectly, their reliance on 'work for hire' or an assignment may give them a copyright interest that they did not bargain for.
 
 
 56
 Easter Seal, 815 F.2d at 333. In a case such as this, for example, application of the supervision and control test could lead to different results for each of the lithographs. The original commission provided that three of the four lithographs were to be on pre-determined subjects, the fourth on a subject of Nagel's own choosing. Under Aldon, the first three might be works for hire, while the fourth would not, since ITT lacked the requisite supervision and control. And yet the parties bargained for the same price for all four lithographs.
 
 
 57
 Also, the Aldon test could not be the only test to determine "employee" for purposes of Sec. 101(1). Surely if an employer hires an artist as a salaried employee, "he would not need to actually supervise the work of the artist in order ... to own the copyright as the statutory 'author.' " Easter Seal, 815 F.2d at 334. The requirement in Aldon that a court distinguish between "employees" and "independent contractors" for purposes of applying the supervision and control test under Sec. 101(1) adds uncertainty and distorts the literal meaning of the Sec. 101 definitions. The dichotomy between employees and independent contractors already is reflected in the dichotomy between Sec. 101(1) and (2). The statute should not be rewritten judicially to recreate the same dichotomy within Sec. 101(1) itself.
 
 
 58
 The Fifth and D.C. Circuits recognize the structure of the 1976 Act. InEaster Seal, the Fifth Circuit held that a public television station hired to produce a film for use by the Easter Seal Society was not an "employee" under Sec. 101(1). It reached its result by interpreting the statutory term "employee" according to the common law of agency.[15] 815 F.2d at 334-35.[16] Under this analysis, actual control and the right of control are relevant, but are not determinative. Id. at 335-36. The majority of independent contractors who produce copyrightable works for someone else are the authors and their works are not made for hire. Only if agency law principles would find the artist to be an employee of the purchaser, or if the works fall under any of the enumerated "works for hire" in Sec. 101(2) and the parties have a written agreement, are the works "made for hire." Easter Seal was followed by the D.C. Circuit in Community for Creative Non-Violence v. Reid, 846 F.2d 1485, 1494 (D.C.Cir.), cert. granted, --- U.S. ----, 109 S.Ct. 362, 102 L.Ed.2d 352 (1988). That court held that a non-profit organization which conceived of the idea for a Nativity scene and hired a sculptor to render three figures and a shopping cart was not the author of the sculpture under the work for hire doctrine, since the sculptor was an independent contractor.[17]
 
 
 59
 We are in essential agreement with this interpretation. We suggest only that in adopting agency law principles to distinguish employees from independent contractors, the Fifth Circuit indirectly includes the rejected "supervision and control" test, because agency law considers relevant "the extent of control which, by the agreement, the master may exercise over the details of the work." Restatement (Second) of Agency Sec. 220(2)(a) (1958). Thus, even under Easter Seal, a work-by-work analysis may be required to determine ownership disputes, and some independent contractors could be deemed "employees" where the purchaser includes provisions in the contract granting it substantial rights of control. This was not intended by the drafters. Because the work for hire doctrine as finally agreed upon in the compromise effects an implicit transfer of copyright ownership while simultaneously destroying the artist's right to terminate the transfer, the drafters wanted a bright line between employees and independent contractors, so that the parties would not be mistaken in their appraisal of the contracted work's status, and purchasers would have little ability to change the artist's presumed status without the artist being fully aware of the change.[18]
 
 
 60
 The Fifth Circuit felt constrained not to limit its definition of "employee" to formal, salaried employees, in order to make sense of the language in Sec. 201(b) that "[i]n the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author ..." (emphasis added). Easter Seal, 815 F.2d at 330. We are not similarly troubled. Sec. 101(2) provides that some commissioned works may be works for hire. The commissioning party will not necessarily be an "employer" under the intended interpretation of "employee." Thus, it was necessary in Sec. 201(b) to provide for "other person[s]" in order to parallel the dichotomy of Sec. 101.[19]
 
 
 61
 By defining "employee" to cover only formal, salaried employees, few disputes should arise as to the status of the artist. Where the artist holds himself or herself out as a freelancer, the employer should anticipate that the commissioned work will not be a work for hire under Sec. 101(1). When the issue is raised in the context of deciding the parties' status when the relationship is ambiguous, relevant factors will be such things as (1) whether the artist worked in his or her own studio or on the premises of the buyer;[20] (2) whether the buyer is in the regular business of creating works of the type purchased;[21] (3) whether the artist works for several buyers at a time, or exclusively for one; (4) whether the buyer retains authority to assign additional projects to the artist; (5) the tax treatment of the relationship by the parties; (6) whether the artist is hired through the channels the buyer customarily uses for hiring new employees; (7) whether the artist is paid a salary or wages, or is paid a flat fee; and (8) whether the artist obtains from the buyer all benefits customarily extended to its regular employees. While the degree of control and input exercised by the buyer may be relevant to an inquiry into joint authorship,[22] it will not ordinarily be relevant in determining the employment status of the artist, just as this factor is not relevant in distinguishing between, for example, in-house and outside counsel.
 
 III. CONCLUSION
 
 62
 We conclude that only works produced by formal, salaried employees are covered by 17 U.S.C. Sec. 101(1). Works by independent contractors are works for hire only when the requirements of 17 U.S.C. Sec. 101(2) are satisfied. Nagel was not an "employee" of D'Arcy or ITT for purposes of Sec. 101(1). The ITT works do not meet the requirements of Sec. 101(2). Therefore they are not "works made for hire." The district court's decision granting the preliminary injunction is AFFIRMED.
 
 
 
 [1]
 We adopt the nomenclature used by the district court
 
 
 [2]
 Both parties agree that the value of Nagel's artwork increased dramatically after his death
 
 
 [3]
 At oral argument before this court, Gommerman raised for the first time the issue of whether ITT or D'Arcy could be considered a "joint author" of the ITT works under 17 U.S.C. Secs. 101 and 201(a). In that case, Gommerman as successor in interest would have the right to reproduce and distribute the works, subject only to a duty to account to Dumas for her share of the profits. 17 U.S.C. Sec. 201(a); Pye v. Mitchell, 574 F.2d 476, 480 (9th Cir.1978). Since this argument was not presented at the district court level, it cannot be raised for the first time on appeal. Rothman v. Hosp. Service of Southern California, 510 F.2d 956, 960 (9th Cir.1975). The district court is not, of course, precluded from considering the possibility of joint authorship at trial if the matter is raised properly
 Gommerman argues that Community for Creative Non-Violence v. Reid, 846 F.2d 1485, 1496 n. 14 (D.C.Cir.), cert. granted, --- U.S. ----, 109 S.Ct. 362, 102 L.Ed.2d 352 (1988), requires us to reach his joint authorship arguments. His reliance is misplaced. In Community for Creative Non-Violence, the district court issued a final judgment that declared the challenged work a work for hire. The circuit court reversed that determination in light of the Fifth Circuit's intervening decision in Easter Seal Society v. Playboy Enterprises, 815 F.2d 323 (5th Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 1280, 99 L.Ed.2d 491 (1988). Our case presents a very different situation. Our decision does not require reversal of the district court's work for hire decision; nor is this an appeal from a final decision resolving copyright ownership. Gommerman concedes that joint authorship arguments were available to him at the time this matter was first argued before the district court.
 
 
 [4]
 However, Yardley did not treat the patron as the "author"; the artist was merely presumed to have assigned his copyright, and thus retained his renewal rights. Id. at 32
 
 
 [5]
 This has been called the "instance [sometimes "insistence"] and expense" test, after Brattleboro Publishing Co. v. Winmill Publishing Corp., 369 F.2d 565, 567 (2d Cir.1966). In other words, only when an artist sold a pre-existing work would she be likely to retain the copyright under work for hire law. See Murray, 566 F.2d at 1310 ("whether the motivating factor in producing the work was the employer who induced its creation.") Such a test unduly protects the employer's entrepreneurial idea at the expense of the artist's creative labor
 
 
 [6]
 Commentators agree with near unanimity that the 1976 Act embodies a clear break with prior doctrine. See Litman, Copyright, Compromise, and Legislative History, 72 Cornell L.Rev. 857, 900-01 (1987); Dreyfuss, The Creative Employee and the Copyright Act of 1976, 54 U.Chi.L.Rev. 590, 598-99 (1987); Comment, The 'Works Made for Hire' Doctrine and the Employee/Independent Contractor Dichotomy: The Need For Congressional Clarification, 10 COMM/ENT: Hastings J. Comm. & Ent.L. 591, 605-08 (1988); Comment, Commissioned Works as Works Made for Hire Under the 1976 Copyright Act: Misinterpretation and Injustice, 135 U.Pa.L.Rev. 1281, 1293 (1987); Note, The Freelancer's Trap: Work for Hire Under the Copyright Act of 1976, 86 W.Va.L.Rev. 1305, 1321 (1984); but see O'Meara, 'Works Made for Hire' Under the Copyright Act of 1976--Two Interpretations, 15 Creighton L.Rev. 523 (1982) (finds legislative history ambiguous, but supports continuation of conservative interpretation)
 
 
 [7]
 Rights in unpublished works were left to common law or equity. 17 U.S.C. Sec. 2 (repealed)
 
 
 [8]
 The 1976 Act preempts common law and state law governing unpublished works. 17 U.S.C. Sec. 301
 
 
 [9]
 Sec. 202 and Sec. 204(a) interact so as to change the common law doctrine of Pushman v. New York Graphic Society, Inc., 287 N.Y. 302, 39 N.E.2d 249 (1942), under which artists are presumed to transfer common law copyright upon sale of the work itself. H.R.Rep. No. 94-1476, 94th Cong., 2d Sess. 124 (1976), U.S.Code Cong. & Admin.News 1976, pp. 5659, 5739
 
 
 [10]
 Not surprisingly, the scope of the work for hire doctrine was closely linked with the issue of termination of transfers and licenses of copyrights in the debate which led to the 1976 Act. See, e.g., House Comm. on the Judiciary, 88th Cong., 1st Sess., Copyright Law Revision Part 2: Discussion and Comments on Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law 358-59, 411 (Comm. Print 1963); House Comm. on the Judiciary, 88th Cong., 2d Sess., Copyright Law Revision Part 3: Preliminary Draft and Discussion and Comments 262-63, 257-75 (Comm. Print 1964); House Comm. on the Judiciary, 88th Cong., 2d Sess., Copyright Law Revision Part 4: Further Discussion and Comments on Preliminary Draft for revised U.S. Copyright Law 248-50 (Comm. Print 1964); House Comm. on the Judiciary, 89th Cong., 1st Sess., Copyright Law Revision Part 5: 1964 Revision Bill with Discussion and Comments 145 (Comm. Print 1965)
 
 
 [11]
 See H.R. 4347, 89th Cong., 1st Sess. (1965). This bill originated the dichotomy between works created by employees within the scope of their employment and works created on commission which is now found in Sec. 101. At that time, only four categories of commissioned work were included: contributions to collective works, motion pictures, translations, and supplementary works. The other five categories provided for in Sec. 101(2) were added subsequently
 
 
 [12]
 Proposed Sec. 14(c) itself provided that "In the case of a work made for hire, the employer shall ... be considered the author."
 
 
 [13]
 Section 14(b) was also revised to include the phrase "or other person for whom the work was prepared," Copyright Law Revision Part 5, at 9, presumably to account for purchasers of commissioned works. See id. at 146-48. Irwin Karp pointed out the oddity, still in the statute, of the interaction between Sec. 54's requirement that an agreement in writing is necessary for a commissioned work to be "for hire," and Sec. 14(b)'s requirement that a writing is necessary for a work to be taken out of work for hire status once that status applies. Id. While such an odd exchange of rights is unlikely to occur in the case of commissioned works, this example of less-than-perfectly elegant drafting does not affect our interpretation of Sec. 101(1), since Sec. 201(b)'s statute of frauds is clearly intended to apply mainly to "employees" under Sec. 101(1)
 
 
 [14]
 The subsequent history of the 1965 compromise, leading to its enactment in 1976, is described in Litman, at 868 (footnotes omitted):
 "Over the next ten years several witnesses appeared before Congress with proposals to vary the package. The Registers of Copyrights, however, consistently advised Congress to resist suggestions to alter the terms of the compromise. Congress enacted the relevant provisions essentially without change.... Because the controversy surrounding the provisions disappeared once the parties reached a compromise, however, Congress gave the provisions little or no detailed consideration, ... Thus, there is no evidence whatsoever of what members of Congress believed the language to mean."
 
 
 [15]
 The Restatement of Agency (Second) defines an employee thus:
 Sec. 220. Definition of a Servant
 (1) A servant is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control.
 (2) In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered:
 (a) the extent of control which, by the agreement, the master may exercise over the details of the work;
 (b) whether or not the one employed is engaged in a distinct occupation or business;
 (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
 (d) the skill required in the particular occupation;
 (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;
 (f) the length of time for which the person is employed;
 (g) the method of payment, whether by the time or by the job;
 (h) whether or not the work is a part of the regular business of the employer;
 (i) whether or not the parties believe they are creating the relation of master and servant; and
 (j) whether the principal is or is not in business.
 
 
 [16]
 According to Easter Seal, although the term "employee" can be used in many legal contexts, the phrase "scope of employment" is a term of art in agency law, and therefore its use suggests congressional intent to incorporate agency doctrine. Id. at 335
 We do not find this conclusion inescapable. If the phrase "scope of employment" were deleted, the statute could be interpreted to give an employer copyright in any work produced by an employee, even if done outside of that employee's job. Compare Scherr v. Universal Match Corp., 417 F.2d 497, 500-01 (2d Cir.1969) (copyright to statute prepared by servicemen as part of military duties, even though partly created during off-duty hours, belongs to government) with Public Affairs Assocs., Inc. v. Rickover, 284 F.2d 262, 268-69 (D.C.Cir.1960), vacated per curiam on other grounds, 369 U.S. 111, 82 S.Ct. 580, 7 L.Ed.2d 604 (1962), on remand, 268 F.Supp. 444 (D.C.Cir.1967) (public speeches of naval officer prepared outside of normal working hours not treated as governmental publications, even though government duplicating machine, paper and secretary used by author).
 
 
 [17]
 The Fourth Circuit has also discussed the meaning of Sec. 101. Brunswick Beacon v. Schock-Hopchas Pub. Co., 810 F.2d 410 (4th Cir.1987). That case involved a dispute over ownership in advertisements as between two newspapers. One of the papers provided the services of its own employees in developing layouts following the advertisers' requirements. The other copied and ran the ads with the permission of the advertisers. The court cited Aldon in discussing contexts in which employees of one employer could, for particular purposes, be considered employees of a second employer. 810 F.2d at 413. At the same time, it indicated without further elaboration that the meaning of "employee" and "scope of employment" "is to be derived from the general law of agency." Id
 
 
 [18]
 Nor does the Restatement of Agency provide a "good fit" in the copyright context. While broad, generalized definitions of terms such as "employee" may be desirable in common law situations or statutory schemes applying to a wide variety of situations, often unforseeable, it must be remembered that the Copyright Act applies to a relatively narrow class of persons and situations. The drafters recognized this and intended the definition to be tailored to the realities of the copyright marketplace. Agency law principles, because they apply so broadly, do not provide the clarity required by the Act
 A work for hire doctrine paralleling agency law definitions was mentioned as a possibility during the revision process in Varmer, Works Made for Hire and on Commission, Study No. 13 for the Senate Subcommittee on Patents, Trademarks, and Copyrights, 86th Cong., 1st Sess., Copyright Law Revision (Comm. Print 1961). However, implicit in this suggestion was the assumption that one definition would be used for all situations, formal employees as well as artists working on commission. The 1976 Act solved this problem by defining the scope of the doctrine separately for the two categories, eliminating the need to apply agency law principles to the term "employee" as used in Sec. 101(1).
 
 
 [19]
 See infra note 13
 
 
 [20]
 See Committee for Creative Non-Violence, 846 F.2d at 1494 n. 11
 
 
 [21]
 Id
 
 
 [22]
 In situations where the commissioning party provides significant creative input, the two might be co-authors of a "joint work" as provided for elsewhere in the Act. 17 U.S.C. Secs. 101, 201(a). See Community for Creative Non-Violence v. Reid, 846 F.2d at 1495-98 (finding co-authorship in artist who produced sculpture and commissioning party who conceived of idea for overall sculpture and designed and created the pedestal)