CALIFORNIA INDEPENDENT SYS-
TEM OPERATOR CORPORA-
TION, Plaintiff,

v.

RELIANT ENERGY SERVICES,
INC., et al., Defendants.

No. CIV.S-01-238 FCD/JFM.

United States District Court,
E.D. California.

March 21, 2001.

Norma G. Formanek, Farella, Braun & Martel, San Francisco, CA, for California Independent System Operator Corp.

Vickie Pochelle Whitney, Hiren Madhubhai Patel, Attorney General's Office of California, Sacramento, CA, for People of California.

Terry James Houlihan, McCutchen, Doyle, Brown & Enersen, San Francisco, CA, for Reliant Energy Services, Inc.

Alex Anton Goldberg, Timothy Muller, Williams Companies, Tulsa, OK, for Williams Energy Marketing and Trading Co.

## ORDER GRANTING PRELIMINARY INJUNCTION

DAMRELL, District Judge.

This lawsuit concerns the obligation of certain generators to respond to emergency dispatch instructions [1] for electric power issued by plaintiff California Independent System Operator Corporation ("the ISO").[2] This matter is before the court on the following motions: (1) the ISO's motion for preliminary injunction requiring Reliant to respond to emergency dispatch instructions issued by the ISO; [3] (2) Reliant's motion to dismiss the action for lack of jurisdiction, or alternatively, to stay the action under the doctrine of primary jurisdiction; and (3) the California Department of Water Resources' ("DWR") motion to dismiss the third-party complaint filed against it by Reliant on Eleventh Amendment immunity grounds. By this order, the court now rules on the pending motions

## BACKGROUND

### 1. California's Electric Power Market

The ISO is responsible for controlling and maintaining California's electric power transmission grid. As part of its responsibilities, the ISO acts as a power "broker" between the generators and utilities. These transactions are governed by the ISO Tariff.[4]

California's electric power market is comprised of two sub-markets: the "advance market" and the "real time market." In the advance market, the ISO accepts and coordinates power "schedules" submitted by utilities that qualify as "scheduling coordinators." These schedules represent advance statements of the quantities of electricity the scheduling coordinator anticipates its customers will consume the day after the schedule is submitted, together with quantities of electric generation that the scheduling coordinator anticipates having available the next day to meet those projected demands. This process is repeated an hour before actual operations, to give the utilities a chance to make adjustments to their schedules to account for changes in weather, the status of generating units and other factors. *See* ISO Tariff §§ 2.2.3, 2.2.11—2.2.13.

Even with the opportunity for hour-ahead adjustments, actual customer demand for electricity and actual output of generating units may differ from the demands and operating levels reflected in the utilities' schedules. The ISO is responsible for ensuring that unscheduled demands for electricity in real time operations are matched by additional electricity from generating units. If customer demand is not

---

1. The term "emergency dispatch instruction" is synonymous with "emergency dispatch order." The court uses the term "instruction" herein because that is term used in the ISO Tariff, and by the Federal Energy Regulatory Commission ("FERC").

2. Defendants include Reliant Energy Services, Inc., Reliant Energy Ormand Beach LLC, Reliant Energy Mandalay, LLC, Reliant Energy Etiwanda, LLC, Reliant Energy Coolwater, LLC, and Reliant Energy Ellwood, LLC (collectively referred to herein as "Reliant"), Williams Energy Marketing & Trading Company ("Williams"), AES Placerita Inc., AES Alamitos, LLC, AES Huntington Beach,

LLC, AES Redondo Beach, LLC (collectively "AES"), and Dynegy Power Corporation ("Dynegy").

3. As discussed below, all defendants except Reliant have entered into a stipulation with the ISO which moots, at least temporarily, the ISO's pending motion for preliminary injunction as to those defendants.

4. The ISO Tariff was filed with and approved by the Federal Energy Regulatory Commission pursuant to Section 205 of the Federal Power Act, 16 U.S.C. § 824d.

met by scheduled supplies in the advance market, the ISO must procure additional electricity to maintain the reliability of the transmission grid and serve customer demand. To meet unscheduled demands, the ISO accepts bids from generators to supply electricity in real time. The bid portion of the real time market is referred to as the "imbalance market." When the amount of electricity available to the ISO in the imbalance market is insufficient, the ISO issues emergency dispatch instructions to its participating generators which are obligated, under the ISO Tariff, to supply power when called upon by the ISO to avert outages. *See id.* § 5.1.3. If the ISO is unable to obtain sufficient power through the issuance of emergency dispatch instructions, it must order rolling blackouts in order to avoid a system-wide "crash" of the transmission grid. The obligation of generators to respond to emergency dispatch instructions is the subject of this action.

### 2. The California Power Crisis

On January 17, 2001, Governor Gray Davis proclaimed a State of Emergency in response to California's energy crisis. In January and February 2001, the ISO declared a series of "Stage 3" Emergencies. *See* Ex. A to Stout Decl., filed Mar. 15, 2001. Stage 3 Emergencies are declared only when electricity operating reserves fall below (or are expected to fall below within the next two hours) a margin of 1 to 1–1/2 percent.

**5.** PG & E and SCE have incurred enormous debts buying wholesale power at prices that exceed the prices they can charge their customers. PG & E and SCE have defaulted on various debts, precipitating financial uncertainty throughout the industry.

**6.** The order was subsequently extended by the current Secretary of the United States Department of Energy.

**7.** The letter stated in pertinent part:

The serious financial problems of California's investor-owned utilities, Pacific Gas & Electric ("PG & E") and Southern California Edison ("SCE"), have contributed significantly to the crisis.[5] As a result of these problems, many power generators, including Reliant, have not been paid for a significant portion of the electricity they have supplied, and are reluctant to continue selling electricity to the utilities (via the ISO) in the absence of assurances they will be paid.

To ensure the continued flow of electricity, on December 14, 2000, the then-Secretary of the United States Department of Energy stepped in and ordered a host of power generators, including Reliant, "to make arrangements to generate, deliver, interchange, and transmit electric energy when, as, and in such amounts as may be requested by the [ISO]."[6] Amendment 2 to Jan. 11, 2001 Ord., dated Jan. 23, 2001, attached as Ex. D to Verified Compl., filed Feb. 6, 2001. In anticipation of the expiration of that order, on February 7, 2001, the ISO sent a letter to generators operating in its market pursuant to the ISO Tariff, requesting assurances that the generators would continue to comply with any and all emergency dispatch instructions issued by the ISO notwithstanding the financial problems described above, and in the absence of any assurances that they would be fully compensated for power supplied pursuant thereto, or for power previously supplied.[7] Defendants' failure to provide ade-

As you are probably aware, recent Securities and Exchange Commission filings by [the California utilities] indicate that the ISO may not be paid in full when settlement payments fall due on February 2, 2001. In that event, the ISO will make only pro rata payments to suppliers for these services as provided in the Tariff. Despite these circumstances, the ISO is committed to carrying out its mission of ensuring reliable, continuing service to Cal-

quate assurances in this regard prompted the instant action.[8]

### 3. Current Market Share Of Emergency Dispatch Instructions

As outlined above, the ISO issues emergency dispatch instructions when (1) customer demand in the real time market is not met by scheduled supplies in the advance market, and (2) the ISO is unable to make up the shortfall through bids from generators to supply power in real time. In recent months, the real time market has constituted approximately 25% of the entire market. *See* Detmers Decl., filed Mar. 20, 2001, ¶ 8, and Ex. E attached thereto. Emergency dispatch instructions have constituted approximately 50% of the real time market. *Id.* Thus, in recent months, emergency dispatch instructions have accounted for roughly 12.5% of all power supplied through the grid. *Id.*

### 4. DWR's Entry Into The Market

Earlier this year, DWR was appropriated significant funds with which to purchase electricity,[9] and has entered into a number of long-term contracts with generators. As discussed below, last month DWR entered into a short term agreement with Reliant in which it agreed to pay for power provided pursuant to emergency dispatch instructions.

### 5. The Instant Litigation

The ISO filed this action, along with an application for temporary restraining order, on the morning of February 6, 2001. Reliant immediately filed a motion to dismiss the action for lack of jurisdiction. The court heard the ISO's application for temporary restraining order later that day, and granted the application as to Reliant, ordering Reliant to continue to sell electricity to the utilities via the ISO and to continue to respond to emergency dispatch instructions.[10] The order was to remain in effect pending a further hearing on the matter on February 7, 2001 at 3:00 p.m. The remaining defendants stipulated that they would continue to respond to emergency dispatch instructions until the conclusion of that hearing, and thus, were not subject to the court's temporary restraining order.

At the February 7, 2001 hearing, the court denied Reliant's motion to dismiss and extended the temporary restraining order against Reliant until 5:00 p.m. (PST) on February 8, 2001, pending issuance of a written order. The remaining defendants again stipulated that they would continue to abide by the provisions of the ISO Tariff, and would continue to respond to emergency dispatch instructions, until that time. *See* Feb. 7, 2001 Hr'g Trans. at 100–01. The court further ordered defendants to appear on February 16, 2001 to show

---

ifornia consumers and so asks for your commitment to comply with any and all dispatch instructions to units covered by the PGA.
Jan. 31, 2001 letter, attached as Ex. I to Verified Compl., filed Feb. 6, 2001.

**8.** It should be noted that AES does not take issue, at least in the present litigation, with the creditworthiness issue, but rather, with its obligation to respond to emergency dispatch instructions where such response would violate state and/or federal environmental laws. The court addressed this issue in its tempo-

rary restraining order. *See* TRO, filed Feb. 8, 2001, at 11 n. 6.

**9.** *See* California Assembly Bill 1x (approved by Governor Feb. 1, 2001; filed with Sec'y of State Feb. 1, 2001); Senate Bill 7x (approved by Governor Jan. 19, 2001; filed with Sec'y of State Jan. 19, 2001).

**10.** The court also granted the motion of the State of California *ex rel* Electricity Oversight Board ("EOB") to intervene in this action at the February 6, 2001 hearing.

cause why a preliminary injunction should not issue. In its written order filed February 8, 2001, the court enjoined all defendants, requiring them to comply with the terms of the ISO Tariff and to continue to respond to emergency dispatch instructions pending the February 16, 2001 hearing and disposition of the order to show cause. *See* TRO at 11.

On February 12, 2001, Reliant filed an application for a temporary restraining order against the ISO, a motion to join DWR as a party, and a third-party complaint against DWR. On February 14, 2001, DWR filed a motion to dismiss the third-party complaint on Eleventh Amendment immunity grounds.[11] On February 15, 2001, Reliant filed a second motion to dismiss for lack of jurisdiction, or alternatively, to stay based on the doctrine of primary jurisdiction. These motions, as well as Reliant's application for a temporary restraining order, were set for hearing on February 16, 2001, along with the ISO's motion for preliminary injunction.

At the February 16, 2001 hearing, Reliant withdrew its motion for temporary restraining order. *See* Feb. 16, 2000 Hr'g Trans. at 68, 83. At the close of the hearing, the court took the remaining matters under submission, and stated its intent to issue a written order not later than Wednesday, February 21, 2001 at 5:00 p.m. The court also extended the temporary restraining order to 5:00 p.m. on February 21, 2001. *Id.* at 112–14.

During the course of the February 16 hearing, at side bar, the court was informed by counsel for Dynegy and Reliant that those defendants had entered into agreement with DWR, which, according to the same counsel, obviated the need to rule on the pending motions. Those agreements, however, were not available at the close of the hearing, and were not made available to opposing counsel or the court until Monday, February 19, 2001 (Reliant–DWR agreement) and Tuesday, February 20, 2001 (Dynegy–DWR agreement).[12]

On February 21, this court held a telephonic status conference *in camera* to discuss the effect of those agreements filed under seal on the pending motions and litigation. Based on the terms of those confidential agreements and the representations of counsel, it appeared the parties might enter into a stipulation which would temporarily moot the pending motions. Accordingly, at the request of the parties, the court set the matter for a telephonic status conference *in camera* on February 23, 2001 at 2:00 p.m. to allow the parties sufficient time to enter into such a stipulation, and extended the temporary restraining order to 5:00 p.m., Friday, February 23, 2001. *See* Order Extending TRO, filed Feb. 21, 2001.[13]

On February 23, the ISO, Reliant, Dynegy and Williams submitted a stipulation and proposed order pursuant to which those defendants agreed to comply with emergency dispatch instructions until 5:00 p.m. on March 19, 2001.[14] At the Febru-

---

11. The parties agreed that DWR's opposition to Reliant's motion to join DWR as a party was properly treated as a motion to dismiss the third-party complaint. *See* Feb. 16, 2001 Hr'g Trans. at 67–68.

12. Those agreements were filed under seal.

13. Because the telephonic status conference would necessarily involve a discussion of the

contents of the confidential agreements between defendants and DWR, which were filed under seal, the court, at the request of the parties, again ordered that the telephonic status conference take place *in camera*.

14. The stipulation and order also provided for termination by any party on two-days notice.

ary 23 status conference, the ISO and AES also entered into a stipulation pursuant to which AES agreed to comply with emergency dispatch instructions. A further status conference was set for March 16, 2001. The temporary restraining order expired at 5:00 p.m. on February 23, 2001.

On March 9, 2001, the parties filed a joint status conference statement and advised the court that Dynegy had orally agreed to extend the February 23, 2001 stipulation pending a ruling by the FERC on an "emergency request" filed with the FERC on February 22, 2001,[15] and that Williams was willing to do the same. With respect to the remaining defendants, the parties essentially agreed that the pending motions were properly deemed submitted.

At approximately 4:00 p.m. on Thursday, March 15, 2001, the court received Reliant's supplemental opposition to the ISO's motion for preliminary injunction. Two supplemental supporting declarations containing extensive exhibits were received approximately one hour earlier. These supplemental documents were submitted without the court's permission. However, at the March 16, 2001 status conference, the ISO and the EOB were granted permission to file supplemental replies not later than March 20, 2001.

At the March 16, 2001 status conference, Dynegy, Williams and AES stipulated on the record that they would continue the February 23 stipulations until the FERC ruled on the February 22 emergency request. *See* Mar. 16, 2001 Hr'g Trans. at 5–7. The ISO accepted their stipulation, and agreed that its motion for a preliminary injunction was mooted, at least temporarily, as to those defendants. *See id.* at 6–7. Reliant would not enter into a similar stipulation. Reliant did, however, agree to

stipulate to respond to emergency dispatch instructions until 5:00 p.m. Wednesday, March 21, 2001, to allow the ISO and the EOB an opportunity to respond to its supplemental brief. *See id.* at 29–30.

The court has received and reviewed the ISO's and the EOB's supplemental replies, the ISO's objection to the Declarations of Thomas Hixson and exhibits attached thereto, and the extensive briefing submitted by all parties in connection with the ISO's motion for preliminary injunction, Reliant's motion to dismiss, and DWR's motion to dismiss Reliant's third-party complaint. The court has also given careful consideration to the arguments and testimony presented at the hearings on these matters. For the reasons set forth below, Reliant's motion to dismiss or stay is denied, DWR's motion to dismiss is granted, and the ISO's motion for a preliminary injunction is granted subject to the limitations set forth below.

## ANALYSIS

### 1. Reliant's Motion To Dismiss Or Stay

On February 15, 2001, Reliant filed a motion to dismiss or stay based of the FERC's February 14, 2001 order. Reliant moved this court to dismiss the underlying action in its entirety for lack of jurisdiction and failure to state a claim on which relief can be granted, or alternatively, to stay the action under the primary jurisdiction doctrine.

### A. Motion to Dismiss

Reliant's motion to dismiss hinges on its interpretation of the FERC's February 14, 2001 order as finding that "the credit provisions of the Tariff *do* apply to real time

---

**15.** The substance of this request is discussed below in connection with Reliant's motion to stay.

transactions." Reliant's Mem. of P. & A. in Support, filed Feb. 15, 2001, at 2 (emphasis in original). Reliant's interpretation finds little, if any, support in the FERC's order. Before addressing the merits of Reliant's argument, some background information concerning the FERC's order is required.

■ On February 14, 2001, the FERC issued an "Order Addressing Creditworthiness Tariff Provisions Proposed By the California Independent System Operator And California Power Exchange." *See* FERC Ord., filed Feb. 14, 2001, attached as Ex. A to Reliant's Mot. to Dismiss, filed Feb. 15, 2001 ("FERC Ord."). That order was issued, in part, in response to proposed Amendment No. 36 filed by the ISO on January 4, 2001 "to revise the Approved Credit Rating requirements of the [ISO] tariff." FERC Ord. at 2. Proposed Amendment No. 36 "gives the ISO temporary authority to waive the requirement that UDCs[16] without an Approved Credit Rating post security." *Id.* At the time it filed Amendment No. 36, the ISO announced that it would implement it immediately, and requested that the FERC approve it *nunc pro tunc* to January 4, 2001.

As discussed below in connection with the ISO's motion for preliminary injunction, without Amendment No. 36, the ISO Tariff requires scheduling coordinators to maintain an "Approved Credit Rating," or alternatively, to post security. *See* ISO Tariff § 2.2.3.2. Scheduling coordinators

that fail to obey these requirements are prohibited from submitting schedules to the ISO. *See id.* § 2.2.7.3.

In its February 14 order, the FERC "conditionally accept[ed] Amendment No. 36 ... for filing to become effective January 4, 2001, subject to clarification and guidance provided below ...." More specifically, the FERC "accept[ed] the amendments to the extent they allow PG & E and SoCal Edison to continue to schedule transactions from generation and over transmission they own to serve their own load," and "den[ied] the amendments to the extent they allow PG & E and SoCal Edison to continue to schedule transactions from third-party suppliers without adequate assurance of payment." *Id.* at 1–2. According to the FERC, those "actions should help in maintaining the reliability of system operations and in encouraging the entry of lower-cost supply into California markets." *Id.* at 2.

Reliant interprets the FERC order to hold that the creditworthiness provisions of the ISO Tariff apply to all real time transactions, including emergency dispatch instructions. They plainly do not. In its order, the FERC recognizes that the tariff's creditworthy requirements apply to the *scheduled* delivery of electric power.[17] As discussed above and in the court's temporary restraining order, power is "scheduled" in the advance market, not the real time market.[18]

---

**16.** "UDC" stands for investor-owned utility distribution company. PG & E and SCE are both UDCs.

**17.** *See* FERC Ord. at 1–2; *see also id.* at 10 ("The creditworthiness requirements in the ISO tariff apply not only when a UDC is *scheduling* delivery of power purchased from a third party, but also when a UDC or its Scheduling Coordinator is scheduling its own generation and using its own transmission resources that are now controlled by the

ISO.") (emphasis added); *id.* at 12 (rejecting application of Amendment No. 36 "beyond the UDCs and their Scheduling Coordinators *self-scheduling* their own generation and accessing their own transmission facilities.") (emphasis added).

**18.** The FERC order was filed after the court's temporary restraining order. In the temporary restraining order, the court agreed that enforcement of Amendment 36 would require the court to modify and/or amend the ISO

The FERC order's conclusion supports this interpretation:

Under our order, the ISO can continue to accept the UDCs' schedules to supply their load with their own resources, and DWR's authority to purchase on behalf of the UDCs is acceptable. Thus, *the unresolved creditworthiness issues relate to the UDCs residual load that is served through the ISO's imbalance market.* Under current conditions, there is a bid insufficiency in the ISO's imbalance energy market causing the ISO to issue emergency dispatch instructions in order to meet this residual load and balance the system. By maintaining appropriate creditworthy standards that ensure payment for services by a creditworthy counterparty such as DWR, this order should increase the supply in the energy imbalance market and reduce the need for emergency dispatch instructions.

*Id.* at 13 (emphasis added). Here, the FERC expressly notes that the creditworthiness issue is unresolved as to the imbalance market. As the order indicates, the imbalance market is the market that precedes the issuance of emergency dispatch instructions. If the creditworthiness issue is unresolved as to that market, the order cannot reasonably be construed as resolving the issue as to power supplied in response to emergency dispatch instructions. Moreover, the FERC concludes that by enforcing credit requirements in the scheduled markets, its order "should ... reduce the need for emergency dispatch instructions." *Id.*

---

Tariff, and thus would fall outside of its jurisdiction. *See* TRO at 7. The court disagreed, however, that granting the ISO the relief it seeks implicated Amendment 36 or was otherwise related to the ISO Tariff's credit requirements, as the court construed Amendment 36

In addition to proposed Amendment No. 36, the FERC also purported to "act on various requests for clarification on creditworthiness issues." *Id.* at 1. Among other things, Dynegy sought "clarification that the ISO tariff penalties for failure to comply with emergency dispatch instructions do not apply when purchasers fail to meet the tariff creditworthiness requirements." *Id.* at 4. While FERC initially purports to address the creditworthiness aspects of Dynegy's request, it later states that it will address "the penalty provision for which Dynegy seeks clarification," in a later order. *See id.* at 4, 12–13. Thus, it would appear that the FERC specifically reserved comment on the issue of whether the ISO Tariff's creditworthiness provisions apply to electricity provided in response to emergency dispatch instructions.

Indeed, had the FERC decided the issue, there would have been nothing left to "address" concerning Dynegy's request for clarification of the applicability of penalties for refusing to respond to emergency dispatch instructions, and the FERC would not have deferred action on the request as it appears to have done.

Because the FERC did not decide that the ISO Tariff's creditworthiness provisions apply to the real time market, the FERC's February 14 order does not moot this action. Nor does the relief the ISO seeks, namely compliance with emergency dispatch instructions, conflict with the FERC's February 14 order. Based on the above, the court rejects Reliant's assertion that the FERC "recognized" that the ISO Tariff's creditworthiness provisions apply to purchases in the real time market.[19]

---

to pertain solely to purchases made in the advance market. *Id.* at 8.

19. The court also rejects Reliant's assertion that more recent FERC actions "confirm that this court lacks jurisdiction." *See* Supp. Opp'n at 4, filed Mar. 15, 2001. Reliant

Accordingly, Reliant's motion to dismiss is denied.

## B. Motion to Stay

■ Should the court deny its motion to dismiss, Reliant alternatively argues that the court should stay the case, under the primary jurisdiction doctrine, until the FERC rules on the issue of whether the ISO Tariff's creditworthiness provisions apply to electricity provided in response to emergency dispatch instructions.

■ The ISO is entitled to bring an action for emergency injunctive relief to enforce the ISO Tariff, and this court has jurisdiction over such an action. *See* 16 U.S.C. § 825p. Under the primary jurisdiction doctrine, the court, in its discretion, may stay the action if its resolution concerns matters that are within the special expertise of an administrative agency. *See Chabner v. United of Omaha Ins. Co.*, 225 F.3d 1042, 1051 (9th Cir.2000); *Farley Transp. Co. v. Santa Fe Trail Transp. Co.*, 778 F.2d 1365, 1370 (9th Cir.1985). There is no "fixed formula" for applying this doctrine, and each case must be assessed on its particular facts. *Chabner*, 225 F.3d at 1051; *Farley*, 778 F.2d at 1370.

Clearly, the FERC is an agency with special expertise concerning the ISO Tariff. Absent the extreme exigencies of the California power crisis, the court agrees that a stay pending further action by the FERC would be proper, if not routine. But those are not the facts here. Electricity is in critically short supply. Rolling blackouts are a reality. The health and safety of the people of California are potentially at risk. In light of such imminent irreparable harm, the court declines to stay this action in its entirety.

At the February 16, 2001 hearing, defendants assured this court that while the FERC cannot grant injunctive relief, it will act quickly when necessary. Despite the FERC's express statement in its February 14 order that it would address the applicability of the creditworthiness provisions to emergency dispatch instructions in a future order, on February 22, 2001, several California generators, including Reliant, filed with the FERC a "Request [ ] For Emergency Order To Compel The California Independent System Operator

---

attempts to characterize this case as a dispute over the just and reasonable price of power, a matter it contends the FERC resolved in its March 9, 2001 order. The issue before this court is whether Reliant is obligated to respond to emergency dispatch instructions, and more particularly, whether the ISO Tariff's creditworthiness provisions apply to power provided in response to emergency dispatch instructions. That issue was not addressed by the FERC's March 9, 2001 order or any other FERC order. As set forth above, that issue is currently pending before the FERC. Reliant's arguments concerning DWR's ability and/or obligation to ameliorate any threat of irreparable harm are addressed below in connection with the ISO's motion for preliminary injunction.

Reliant's reliance on the FERC's March 2001 Staff Report is wholly misplaced. *See* Ex. B to Hixson Decl. in Supp. of Supp.

Opp'n, filed Mar. 15, 2001. As stated on the cover of the report, the recommendations contained therein are those of the *staff*, and "do not necessarily reflect the views of the Commission or any of its Commissioners." Reliant notes that the report recommends that "generators should be required to offer all their capacity to the ISO" during a Stage 3 Emergency, and argues that if generators were already so obligated, there would be no need for the recommendation. As the court noted at the March 16, 2001 hearing, the report also recommends that during a Stage 3 Emergency, generators should receive payment at no less than marginal cost. If the generators were already guaranteed payment for such power, as Reliant contends, there would likewise be no need for that recommendation. Accordingly, the staff report does not advance the analysis of the issues before the court.

Corporation To Comply With The Commission's February 14, 2001 Order." *See* Ex. A to Joint Status Report, filed Mar. 9, 2001. In that emergency request, the generators sought an expedited order requiring the ISO "to comply *immediately* with the plain terms of the Commission's February 14 order on creditworthiness issues," including enforcing the ISO Tariff's creditworthiness provisions on purchases made in the real time market. *See* Req. at 1–2. Despite the generators' allegation that the ISO has "repudiated" the "clear directives" of the FERC's February 14 order and the extreme urgency of the request, this matter has been pending before the FERC for a month.[20] This is by no means a criticism of the FERC. Rather, it simply demonstrates that a stay of this entire action may well deny the ISO's ability to avert potentially imminent and irreparable harm to the people of California. Accordingly, Reliant's motion to stay this action in its entirety is denied.

Notwithstanding the above, the fact remains that the critical issue in this case, namely whether the ISO Tariff's creditworthiness provisions apply to electricity provided in response to emergency dispatch instructions, is pending before the FERC. Accordingly, the court preliminarily enjoins Reliant until the FERC rules on this issue.

### 2. DWR's Motion to Dismiss Reliant's Third–Party Complaint

DWR moves to dismiss Reliant's third-party complaint on the ground that it is a state agency, and thus immune from suit under the Eleventh Amendment. Reliant opposes the motion, arguing that the State of California (and thus, DWR) has waived its immunity in this case.

■ The Eleventh Amendment prevents states from being sued by citizens in federal court without the state's consent. *See Papasan v. Allain,* 478 U.S. 265, 276, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986); *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). "[T]he Eleventh Amendment's bar currently applies to all suits brought by an individual against an unconsenting state, regardless of the basis of jurisdiction or the citizenship of the plaintiff, assuming that Congress has not abrogated the states' immunity pursuant to legislation passed with the requisite constitutional power." 13 Wright, Miller & Cooper, *Federal Practice and Procedure* § 3524 (Supp. 2000). Thus, arms of the state such as DWR are "presumptively entitled to Eleventh Amendment immunity." *See Watkins v. Calif. Dept. of Corrections,* 100 F.Supp.2d 1227, 1229 (C.D.Cal.2000).

■ In some circumstances, however, a state can waive its Eleventh Amendment immunity. The test for determining whether such a waiver has occurred "is a stringent one." *See College Savings Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 119 S.Ct. 2219, 2226, 144 L.Ed.2d 605 (1999). "In deciding whether a State has waived its constitutional protection under the Eleventh Amendment, we will find waiver only where stated 'by the most express language or by such overwhelming implications from the text as (will) leave no room for any other reasonable construction.'" *Edelman v. Jordan,* 415 U.S. 651, 673, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) (citation omitted).

■ The Supreme Court has identified two circumstances in which a state, by its

---

**20.** Since issuing its February 14, 2001 order, the FERC has issued three orders concerning the practices of generators in California, but has chosen not to address the application of the creditworthiness requirements to emergency dispatch orders.

own actions,[21] may be found to have waived its Eleventh Amendment immunity. First, waiver occurs when a state voluntarily invokes the jurisdiction of the court, for instance, by filing an action in federal court. *See College Savings Bank*, 119 S.Ct. at 2226 (citing *Gunter v. Atlantic Coast Line R. Co.*, 200 U.S. 273, 284, 26 S.Ct. 252, 50 L.Ed. 477 (1906)).

Second, waiver may be found where the state makes a "clear declaration" of its intention to submit itself to the jurisdiction of a federal court. *See id.* (citing *Great Northern Life Ins. Co. v. Read*, 322 U.S. 47, 54, 64 S.Ct. 873, 88 L.Ed. 1121 (1944)). For example, a state's extensive participation in pre-trial activities during the pendency of a lawsuit can result in such a waiver. *See Hill v. Blind Indus. & Servs. of Md.*, 179 F.3d 754, 762 (9th Cir.1999).

■ Waiver may not be constructive or implied. *See College Savings Bank*, 119 S.Ct. at 2229 (expressly overruling the theory of "constructive waiver" set forth in *Parden v. Terminal Ry. of Ala. Docks Dept.*, 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964)). For instance, a state's participation in federally-regulated conduct does NOT constitute a waiver of Eleventh Amendment immunity from suit in federal courts. *See id.* (immaterial that

state's conduct undertaken for profit and resembles behavior of private parties).

Reliant raises two theories in support of its waiver argument. These theories shall be addressed in turn.

## A. The Meter Service Agreement

■ Reliant argues that DWR has expressly waived its Eleventh Amendment immunity by contractually consenting to suit in federal court. Specifically, Reliant points to a "Meter Service Agreement for Scheduling Coordinators" entered into between DWR and the ISO in 1998 (hereinafter "MSA"). *See* Houlihan Decl., filed February 21, 2001, Ex. A. This MSA, Reliant argues, contains terms allowing suit in federal court, and thus, effectuates a waiver of Eleventh Amendment immunity.[22]

DWR disagrees that it has waived its immunity, stating that the M.S.A. was entered into long before the passage of AB1x, and was the result of DWR's management of its own load and hydroelectric resources. Thus, DWR argues, even assuming the M.S.A. effects some sort of a waiver of Eleventh Amendment immunity, it does not apply to DWR's purchasing activities under AB1x, and thus, does not

21. Waiver may also be found where Congress has validly abrogated state immunity by creating private causes of action against the states to redress violations of the Fourteenth Amendment. *See, e.g., Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). This type of waiver is not at issue here.

22. In support of its position, Reliant cites a single case, *In re Innes*, 184 F.3d 1275, 1282 (10th Cir.1999). In *Innes*, Chapter 13 debtors brought suit against Kansas State University ("KSU") seeking a determination regarding the dischargeability of their student loans on the theory of undue hardship. KSU moved to dismiss the action on grounds of Eleventh Amendment immunity. The court denied the

motion, holding that "KSU knowingly and voluntarily waived its Eleventh Amendment immunity by agreeing, as a prerequisite to its participation in the Perkins Loan Program, to undertake certain enumerated actions in federal bankruptcy court in the event of a claim for discharge filed by the student-borrower." *See Innes*, 184 F.3d at 1284. *Innes* is inapplicable here, because no federal funding program is involved or implicated. Moreover, the *Innes* court observed that KSU's waiver would have been invalid had it lacked the statutory authority to do so. *See id.* Reliant fails to point to any California statutes authorizing DWR to enter into contracts waiving Eleventh Amendment immunity on behalf of the State of California.

effect a waiver with regard to the claims asserted in Reliant's third-party complaint.

The court agrees with DWR's position. Section 11.4 of the MSA, to which Reliant refers, states that DWR and the ISO:

irrevocably consent[ ] that any legal action or proceeding arising under or relating to this Agreement to which the ISO ADR Procedures do not apply shall be brought in any of the following forums, as appropriate: any court of the State of California, any federal court of the United States of America located in the State of California, or, where subject to its jurisdiction, before the Federal Energy Regulatory Commission.

Even assuming the MSA effectuates a waiver of immunity by DWR, such waiver would extend only to suits brought by the ISO relating to the MSA itself.[23] Reliant's third-party complaint does not relate to, or allege violations of, the MSA.

Moreover, given the "stringent" test applied to determine whether a state has waived its immunity, and the requirement that any such waiver be found only where stated "by the most express language or by such overwhelming implications from the text as (will) leave no room for any other reasonable construction," this court cannot conclude that the MSA effectuates a general waiver of California's immunity with respect to all matters, brought by any party, relating to the ISO Tariff. *See College Savings Bank*, 119 S.Ct. at 2226; *Edelman*, 415 U.S. at 673, 94 S.Ct. 1347. Reliant's waiver argument regarding the MSA is rejected.

**B. The State of California's Conduct in This Litigation**

▇▇ Reliant next argues that the State of California's participation in this case constitutes consent by the State of California to suit in this court, thereby waiving the state's Eleventh Amendment immunity. Specifically, Reliant points to the EOB's intervention in this lawsuit, as well as DWR's "litigati[on] of this action on the merits," as evidence of the State of California's waiver. *See* Brief of Reliant, *et al.* on Party Status of Calif. Dept. of Water Resources, filed Feb. 21, 2001, at 7. As discussed below, neither of these actions effectuates a waiver.

*(1) The EOB's Intervention*

Reliant argues that the EOB's intervention in this lawsuit waives the State of California's immunity from suit with respect to claims arising from the same "transaction or occurrence" as the EOB's claims. In support, Reliant cites the Ninth Circuit's recent decision in *In re Lazar*, 237 F.3d 967 (9th Cir.2001). Reliant reads the *Lazar* holding far too broadly.

In *Lazar*, the Ninth Circuit discussed the extent to which a state waives its immunity by filing a proof of claim in bankruptcy, as established in *Gardner v. New Jersey*, 329 U.S. 565, 67 S.Ct. 467, 91 L.Ed. 504 (1947), and codified at 11 U.S.C. § 106(b). After a lengthy discussion of the so-called "Rule of *Gardner*" and the circumstances presented by the case, the *Lazar* court held that "when a state or an 'arm of the state' files a proof of claim in a bankruptcy proceeding, the state waives its Eleventh Amendment immunity with regard to the bankruptcy estate's claims that arise from the same transaction or occurrence as the state's claim." *See Lazar*, 237 F.3d at 978.

*Lazar* applied general rules of Eleventh Amendment immunity to the unique immu-

---

**23.** By this order, the court does not decide whether Section 11.4 of the MSA does, in fact, waive the State of California's immunity with respect to claims relating to the MSA.

nity problem raised in the context of a bankruptcy proceeding in which a state asserts rights to an estate in bankruptcy, and then resists a claim filed by the estate with respect to the same *res* within the jurisdiction of the bankruptcy court. *Lazar* clearly is distinguishable, and Reliant's attempt to apply this rule of bankruptcy law to the facts of this case is unavailing.

Stepping outside the confines of bankruptcy law, Reliant effectively attempts to circumvent DWR's Eleventh Amendment immunity by characterizing Reliant's third-party complaint as a counterclaim against the State of California, in light of the EOB's intervention. This argument fails as well. Assuming DWR and the EOB may be treated as a single entity for purposes of this analysis, any possible waiver of immunity would be strictly limited to compulsory recoupment counterclaims. *See United States v. Iron Mountain Mines*, 952 F.Supp. 673, 678–79 (E.D.Cal. 1996) (state's filing of CERCLA action did not constitute general waiver of Eleventh Amendment immunity); *United States v. Montrose Chem. Corp. of Calif.*, 788 F.Supp. 1485, 1492–93 (C.D.Cal.1992) (Eleventh Amendment immunity waived as to compulsory recoupment counterclaims in tort by filing CERCLA action); *see also Oregon v. City of Rajneeshpuram*, 598 F.Supp. 1217, 1219 (D.Or.1984) (by bringing action in federal court, state waives its Eleventh Amendment immunity with respect to all counterclaims arising out of same transaction or occurrence, "at least to the extent that the counterclaims do not exceed the amounts sought in the state's claim"); *Georgia Dept. of Human Resources v. Bell*, 528 F.Supp. 17, 26 (N.D.Ga.1981) ("[B]y bringing suit against a private party the State waives its Eleventh Amendment immunity and consents to the court's jurisdiction of . . . counterclaim[s] asserted defensively, by way of recoupment, for the purpose of defeating or diminishing the State's recovery, but not for the purpose of obtaining an affirmative judgment against the State.)" (citations omitted).

Here, the EOB's intervention in the ISO's lawsuit seeks injunctive relief ordering Reliant (and other generators) to comply with the emergency dispatch instruction provisions of the ISO Tariff. No monetary damages are sought. By contrast, Reliant's third-party complaint (which, obviously, is not a counterclaim, much less a compulsory counterclaim), seeks declaratory and injunctive relief ordering DWR to use state funds to purchase power from any and all energy markets. *See* Verified Third Party Complaint, filed Feb. 12, 2001, at 8–10. Clearly, resolution of these claims in Reliant's favor would constitute an affirmative judgment against the State. These claims also would require the payment of state funds, and do not serve merely to reduce a monetary claim, since the State of California (through the EOB) is not seeking money damages. Thus, by the EOB's intervention, the State of California cannot be said to have waived its immunity with respect to Reliant's third-party complaint. *See Bell*, 528 F.Supp. at 26.

### (2) DWR's Activities in this Litigation

Reliant next argues that DWR's actions in this case constitute litigation on the merits, thereby waiving its immunity. The court disagrees. To date, DWR has (1) joined in the ISO's opposition to Reliant's motion to dismiss, (2) filed a brief and declaration supporting ISO's application for a temporary restraining order, and (3) appeared at the TRO hearings. All of these actions occurred within the first month after the ISO filed this action. DWR's involvement to date falls far short of that required for a finding of

waiver on grounds of active involvement in pre-trial activities. *See Hill,* 179 F.3d at 762 (state agency waived Eleventh Amendment immunity by actively litigating the case on the merits, and waiting to raise its immunity defense until the first day of trial). Reliant's waiver argument regarding DWR's involvement in this litigation is rejected.[24]

In sum, DWR has met its burden of demonstrating that as an arm of the State of California, it is presumptively immune from suit in federal court. Reliant fails to show how the State of California waived this immunity. Accordingly, DWR's motion to dismiss Reliant's third-party complaint is granted.

### 3. The ISO's Motion For A Preliminary Injunction

■■■ The standard for issuing a preliminary injunction is the same as the standard for issuing a temporary restraining order. *See Dumas v. Gommerman,* 865 F.2d 1093, 1095 (9th Cir.1989). To qualify for a preliminary injunction, the moving party must show (1) a probability of success on the merits, and (2) the possibility of irreparable injury should the restraining order not issue. *See id.* These factors represent two points on a sliding scale, such that "the greater the relative hardship to the moving party, the less probability of success must be shown." *Sun Microsystems, Inc. v. Microsoft Corp.,* 188

F.3d 1115, 1119 (9th Cir.1999) (citation omitted).

After the ISO filed and the court heard the motion for a preliminary injunction, all defendants but Reliant entered into a stipulation with the ISO pursuant to which those defendants will continue to respond to emergency dispatch instructions until the FERC rules on the February 22 emergency request. Accordingly, the ISO's motion for a preliminary injunction as to those defendants is denied without prejudice, and the court addresses the appropriateness of a preliminary injunction as to Reliant only.

### A. Likelihood of Success

■■■ The ISO seeks to compel Reliant to comply with the emergency dispatch instructions. Reliant is obligated to comply with the provisions of the ISO Tariff by virtue of its participation in the California electricity market and use of the California power grid. Reliant has also entered into a Participating Generator Agreement with the ISO, which requires it, as well as the ISO, to comply with the provisions of the ISO Tariff.

Section 5.1.3 of the ISO Tariff provides:

Each Participating Generator shall take, at the direction of the ISO, such action affecting such Generator, as the ISO determines to be necessary to maintain the reliability of the ISO Controlled

---

24. Reliant further argues that if this court grants DWR's motion to dismiss, it should go one step further and dismiss this entire case for failure to join an indispensable party. *See* Fed.R.Civ.P. 19(b). DWR is not an indispensable party, however. Under Rule 19(b), the determination of whether a party is indispensable to an action "requires the consideration of four factors: (1) the extent to which a judgment rendered in the person's absence might be prejudicial to the person or those already parties; (2) the extent to which, by protective provisions in the judgment, by the

shaping of relief, or other measures, the prejudice can be lessened or avoided; (3) whether a judgment rendered in the person's absence will be adequate; and (4) whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder." *Clinton v. Babbitt,* 180 F.3d 1081, 1090 (9th Cir.1999). None of these factors weighs in favor of declaring DWR an indispensable party. The court can fully and fairly adjudicate the claims presented in ISO's complaint without DWR's presence in this case. Reliant's request is denied.

Grid. Such actions shall include ... (a) compliance with the ISO's Dispatch Instructions.

Section 5.6.1 similarly establishes the ISO's authority

to instruct a Participating Generator to bring its Generating Unit on-line, off-line, or increase or curtail the output of the Generating Unit ... if such an instruction is reasonably necessary to prevent an imminent or threatened System Emergency or to retain Operational Control ... during an action System Emergency.

Notwithstanding these express obligations, Reliant contends that its obligation to respond to emergency dispatch instructions is discharged by the absence of a creditworthy buyer. In other words, Reliant contends that the creditworthiness provisions set forth in the ISO Tariff apply to electricity provided in response to emergency dispatch instructions and scheduled transactions alike.

As outlined in the temporary restraining order, the ISO Tariff requires scheduling coordinators to maintain an "Approved Credit Rating," or alternatively, to maintain security in an amount intended to cover its outstanding and estimated liability. *See* ISO Tariff § 2.2.3.2. It is undisputed that PG & E, SCE and their scheduling coordinator no longer maintain an "Approved Credit Rating" as that term is defined in the ISO Tariff. Thus, they must post security. *See id.* § 2.2.7.3. Scheduling coordinators that fail to meet these requirements are prohibited from submitting a schedule to the ISO. *See id.* Power is "scheduled" in the advance market, not the real time market. Accordingly, scheduling coordinators that fail to maintain an "Approved Credit Rating" cannot participate in the advance scheduling process. It does not, however, follow that the ISO Tariff bars the ISO from

issuing emergency dispatch instructions to meet the need of customers of scheduling coordinators that do not meet the Tariff's credit requirements.

As detailed above, Amendment No. 36, as adopted by the FERC, partially relieves scheduling coordinators of this responsibility in that it allows them to participate in the advance market despite their failure to maintain an approved credit rating, or alternatively, post security. FERC's February 14 order does not change the analysis or this court's preliminary conclusion that the creditworthiness provisions apply only to power scheduled in the advance market.

In its supplemental opposition filed the afternoon before the status conference, Reliant argues for the first time that the "ISO's requested injunction would violate the commerce clause." More particularly, Reliant argues that the ISO's position that its emergency dispatch instructions "trump" any existing contracts California generators have with purchasers in other states undermines federal policy and violates the commerce clause, as it "impedes the development of a broader regional market in the West."

Reliant's argument, however, fails to take into account that the ISO issues emergency dispatch instructions when reliability criteria issued by the Western Systems Coordinating Council ("WSCC") are violated. *See* Detmers Decl., filed Mar. 20, 2001, ¶ 7. According to James Detmers, Acting Vice President of Operations for the ISO, "[t]he WSCC is a reliability counsel for the sub-region of North American Electric Reliability Council ("NERC") which includes the western United States, and portions of Canada and Mexico." *Id.* The WSCC's reliability criteria relied on by the ISO were established to protect the entire Western Regional grid, which covers California, Oregon, Washington, Idaho, Nevada, Utah, Colorado, New Mexico, Ari-

zona, Montana, Wyoming and portions of Canada and Mexico. *Id.* Thus, contrary to Reliant's assertions, the ISO does not issue emergency dispatch instructions "at the expense" of its neighbors, but rather pursuant to a set of criteria designed to protect the entire Western region. Given the above, Reliant's eleventh hour argument that the ISO's issuance of emergency dispatch instructions violates interstate interests rings hollow.

For the reasons set forth above, the court finds that there is a substantial likelihood that the ISO will prevail on the merits.[25]

### B. Irreparable Harm

#### (1) Harm to the Public

As noted in the court's temporary restraining order, the State of California is confronting an energy crisis of catastrophic proportions. On January 17, 2001, Governor Gray Davis proclaimed a State of Emergency in response to California's energy crisis. In January and February of this year, the ISO has declared a series of Stage 3 Emergencies and ordered rolling blackouts on several occasions.

At the February 7, 2001 hearing, Mr. Detmers testified that the ISO has been forced to rely on the real time market for a considerable period of time. At the March 16, 2001 status conference, counsel for the ISO maintained that the potential threat of imminent irreparable harm has not changed in any appreciable degree over the past few weeks. While the number of emergency dispatch instructions issued in recent weeks has declined dramatically, counsel for the ISO explained that unusual, unexpected events can, and do, occur and continue to pose an imminent threat of irreparable harm to the people of the State of California. *See also* Detmers Decl., filed Mar. 20, 2001, ¶¶ 6, 9, and Exs. D, F attached thereto. Such unplanned events include generators "falling off-line," transformer burns, and downed power lines. *Id.* For example, a Stage 2 Emergency was declared on March 14, 2001

---

**25.** Reliant previously argued that its obligation to comply with the provisions of the ISO Tariff was discharged by the ISO's failure to comply with the ISO Tariff's creditworthiness provisions. This court rejected that argument, finding that the ISO Tariff has the force and effect of a federal statute, and thus, the ISO's failure to comply with the provisions of the ISO Tariff does not discharge Reliant's duties thereunder, as it might if the ISO Tariff was merely a contract between the parties. *See* TRO at 6–7. *Coughlin v. Trans World Airlines, Inc.*, 847 F.2d 1432 (9th Cir. 1988), relied on by Reliant, does not alter the court's analysis. In the thirteen years since *Coughlin* was decided, it has been cited only eight times (three in the Ninth Circuit), and it has never been applied outside the common carrier context. Nor did that case involve the public interest concerns present here. No court has given *Coughlin* the sweeping effect urged by Reliant, and the court declines to do so here.

More importantly, however, Reliant's argument was prefaced on the ISO's unilateral implementation of Amendment No. 36 prior to approval by the FERC. As noted above, after the court issued its temporary restraining order, the FERC ruled on Amendment No. 36. In pertinent part, as set forth above, the FERC rejected Amendment 36 "to the extent [it] allow[s] PG & E and SoCal Edison to continue to schedule transactions from third-party suppliers without adequate assurance of payment." FERC Ord. at 1–2. There is no evidence, or allegation, that the ISO has breached the FERC's February 14, 2001 order as to purchases made in the advance market. Rather, Reliant contends that the ISO repudiated that order by failing to extend those requirements to power provided in response to emergency dispatch instructions. As set forth above, the court rejects this contention. Accordingly, the ISO is not presently breaching the ISO Tariff or the FERC's February 14 order, and to the extent Reliant argues that its current obligation to respond to emergency dispatch orders is discharged by the ISO's breach, that argument is without merit.

when power from out-of-state providers dropped by 1,200 megawatts. *Id.* ¶ 3. Moreover, at approximately 6:00 a.m. on March 19, 2001, the ISO declared a Stage 2 Emergency due to insufficient system resources. By noon that same day, a Stage 3 Emergency was declared after "two units at a facility tripped offline." *Id.* ¶ 4. Immediately thereafter, the ISO determined that it was necessary to curtail firm load, and rolling blackouts again darkened the California landscape. *Id.*

According to Mr. Detmers, the shortfalls in power vary from 2,000—3,000 megawatts to 8,000—10,000 megawatts. A Stage 3 Emergency occurs when the under-arranged amount ranges from 7,000—8,000 megawatts. Reliant controls approximately 3,800 megawatts of generating capacity in California. While the precise amount of electricity available from Reliant to respond to emergency dispatch instructions is uncertain and in dispute, it is nevertheless significant, and its loss poses an imminent threat of blackouts. Reliant has never disputed that such blackouts pose a dire threat to public health and safety. *See Mississippi Power & Light v. United Gas Pipe Line Co.,* 760 F.2d 618, 623 (5th Cir.1985) (injury to public may suffice as irreparable harm in private action); *see also Northern Indiana Pub. Serv. Co. v. Carbon County Coal Co.,* 799 F.2d 265, 280 (7th Cir.1986) (injury to public may suffice as irreparable harm where public is essentially real party in interest).

### (2) Role of DWR

Reliant continues to argue that any potential for irreparable harm could be cured by DWR. But even assuming DWR could single-handedly palliate the crisis, the Eleventh Amendment precludes this court from subjecting DWR to its jurisdiction. Nor, as a practical matter, does it appear DWR can or will ride to the rescue at any cost. Indeed, the evidence suggests otherwise. As Reliant points out, DWR has refused to extend the February 16, 2001 agreement pursuant to which DWR agreed to pay Reliant a certain contract price for power provided in response to emergency dispatch instructions until March 23, 2001.[26] Nor is there any authority that the ISO can exercise to require DWR to pay Reliant any amount for electricity.

Reliant, in essence, asks this court to do equity. "Equity," in this context, however is circumscribed by the filed rate doctrine. As a result, and as all of the parties have acknowledged, the court's jurisdiction is, therefore, limited to *enforcing* the tariff.

As an alternative to issuing a preliminary injunction, Reliant urges the court to require DWR to contract with Reliant. Not only does the court lack jurisdiction over DWR, but the court is not aware, nor does Reliant cite to, any authority that empowers the court to force anyone, let alone the State of California, to enter into a contract.

The court does not discount the economic harm suffered by Reliant and similarly-situated generators. However, the potential harm to generators that may result from this order must be put into context. Electricity provided pursuant to emergency dispatch instructions currently accounts for approximately 12.5% of elec-

---

**26.** Reliant points to DWR's demonstrated ability to pay for power provided in response to emergency dispatch instructions, as evidenced by the February 16 agreement. According to Reliant, any potential for irreparable harm is caused by DWR's refusal to accept the FERC price. Reliant points out that the FERC's March 9, 2001 order established $273/MWh as a presumptively just and reasonable price during Stage 3 Emergencies in California. To the extent the prices charged by Reliant exceed that cap, Reliant argues that DWR can seek review by the FERC.

tricity provided in the relevant market. Moreover, pursuant to the FERC's order, creditworthy buyers are required for electricity sold in the advance market, which accounts for 75% of the electricity sold in the relevant market. Thus, this case is not about Reliant not being paid for *any* of the power it provides.[27] More importantly, however, purely economic harm is an insufficient basis upon which to grant or deny a preliminary injunction. harm. *See Rent–A–Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir.1991) ("economic injury alone does not support a finding of irreparable harm ...") Reliant has failed to demonstrate that its long-term viability is threatened by the relief sought.

In an enforcement action such as this, the court must enforce the Tariff as it is written. To the extent Reliant contends the Tariff is unfair, that is a matter for the FERC, not this court. Accordingly, the court finds that the potential for imminent irreparable harm to the public remains.

## CONCLUSION

Accordingly, IT IS ORDERED THAT:

1. Reliant's motion to dismiss or stay the matter in its entirety is DENIED.

2. DWR's motion to dismiss Reliant's third-party complaint is GRANTED.

3. The ISO's motion for preliminary injunction as to Dynegy, AES and Williams is DENIED WITHOUT PREJUDICE.

4. The ISO's motion for a preliminary injunction as to Reliant is GRANTED. Reliant shall continue to respond to emergency dispatch instructions until the FERC issues a ruling on the pending Request for an Order to Comply.[28] The parties shall immediately notify the court of the FERC ruling, and the court will set the matter for a further status conference within five days of said notification. The parties shall file and serve a joint status conference statement at least one day prior to such conference. If no order is issued by the FERC within 60 days of this order, a further status conference shall be held on May 25, 2001 at 10:00 a.m. The parties shall file and serve a joint status conference statement not later than May 18, 2001.

5. The bonding requirement under Fed.R.Civ.P. 65(c) is waived, as the ISO, a not-for-profit public benefit corporation, is unable to post a substantial bond. *See People of State of California ex rel. Van De Kamp v. Tahoe Regional Planning Agency*, 766 F.2d 1319, 1325 (9th Cir.1985).

6. The ISO's objections to Exhibits H–N to the Declaration of Thomas S. Hixson In Support of the Supplemental Opposition to Preliminary Injunction, filed Mar. 15, 2001, Exhibits A, B & C to Declaration of Thomas S. Hixson In Support of the Supplemental Opposition to Preliminary Injunction (Attaching Highly Confidential Documents), filed Mar. 15, 2001, and Exhibits F, G & H to Hixson Declaration, are SUSTAINED. The first two sets of exhibits referred to above are not relevant,

---

**27.** The court notes that despite potential and actual economic harm to generators posed by the failure of California's public utilities to pay for past purchases, the ISO and the EOB argue that California's power crisis has been an economic windfall to Reliant and other generators. *See, e.g.*, Reliant Press Release, dated Jan. 26, 2001, attached as Ex. E to Application for TRO, filed Feb. 6, 2001; Reli-

ant's SEC filings, attached as Exs. A–C to EOB's Req. for Judicial Notice, filed Feb. 14, 2001.

**28.** The stipulation entered into by the ISO, Dynegy and Williams employs the identical language. *See* Stip. & Ord., filed Mar. 21, 2001.

in any appreciable way, to the brief they purport to support. The last set of exhibits, press reports relating to long-term power contracts, constitute inadmissible hearsay. *See* Fed.R.Evid. 801.

IT IS SO ORDERED.